# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

**Appeal from**
***Burton v. Hagh Law PLLC, et al.***
**Case No. 3:20-ap-90002**


**Manookian PLLC and Brian Manookian, Appellants**

**v.**

**Trustee Jeanne Ann Burton, Appellee**


**Case No. 3:22-cv-00474**

**Judge Aleta A. Trauger**

---

## APPENDIX TO APPELLANTS' OPENING BRIEF

---




Charles M. Walker
U.S. Bankruptcy Judge
Dated: 6/1/2022

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) Case No: 3:19-bk-07235 |
| Cummings Manookian, PLLC, | ) Chapter 7 |
| | ) Honorable Charles M. Walker |
| Debtor. | ) |
| | ) |
| Jeanne Ann Burton, Trustee, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proc: 3:20-ap-90002 |
| | ) |
| Hagh Law, PLLC; Afsoon Hagh; | ) |
| AND Manookian, PLLC, | ) |
| | ) |
| Defendants. | ) |

## ORDER QUASHING NOTICE OF DEPOSITION

THIS MATTER is before the Court regarding the Notice of Deposition ("Notice") of

Judge Charles M. Walker (Dkt. #177). For the following reasons, and under the noted authority,

the Notice is hereby quashed and thereby, unenforceable.

In a legal proceeding, a request for testimony from personnel of the federal judiciary is

governed by those regulations as set forth in Volume 20, Chapter 8 of the Guide to Judiciary

Policy ("Guide")[1] as established by the Director of the Administrative Office of United States

Courts. *U.S. v. Galvez*, 2019 WL 3927443, at *1 (S.D. Ohio Aug. 20, 2019). Federal judicial

---

[1] Guide to Judiciary Policy, available at https://jnet.ao.dcn/policy-guidance/guide-judiciary-policy/volume-20-administrative-claims-and-litigation/ch-8-testimony-and-production-records

personnel may not provide testimony of the type requested in the Notice of Deposition except as authorized by the provisions of the Guide. See *Guide at* § 820(a)[2].

The Guide is persuasive authority as it codifies the policies promulgated by the Director of the Administrative Office and "approved by the Judicial Conference of the United States." *In re Sony BMG Music Entm't*, 564 F.3d 1, 7 (1st Cir. 2009); see *also Kitzmiller v. Dover Area Sch. Dist.*, 388 F. Supp. 2d 484, 486-87 (M.D. Pa. 2005). It provides the "official medium by which direction as to courtroom procedures and other information are provided to the Federal Judiciary in support of its day-to-day operations." *In re Sony*, 564 F.3d at 7 (quoting *Kitzmiller*, 388 F. Supp. at 486-87). *Mackin v. Om Sai Corp*, 2021 WL 5937589, at *1 (D.N.M. Dec. 16, 2021).

The Notice requests testimony from Judge Charles M. Walker. Accordingly, the Guide controls in consideration of the request contained in the Notice.  According to § 810.30 of the Guide, the following definitions apply:

"Information and records" is defined as follows:

All information, records, documents, or materials of any kind, however stored, that are in the custody or control of the federal judiciary or were acquired by federal judicial personnel in the performance of their official duties or because of their official status.

"Judicial personnel" is defined as:

All present and former officers and employees of the federal judiciary and any other individuals who are or have been appointed by, or subject to the supervision, jurisdiction, or control of, the federal judiciary, including individuals hired through contractual agreements by or on behalf of the federal judiciary, or performing services under such agreements for the federal judiciary, such as consultants, contractors, subcontractors, and their employees and personnel. This phrase also includes alternative dispute resolution neutrals or mediators, special masters, individuals who have served and are serving on any advisory committee or in any advisory capacity, and any similar personnel performing services for the federal judiciary.

---

[2] Any reference to Section refers to a provision of the Guide unless otherwise noted.

"Legal Proceedings" means:

All pretrial, trial, and post-trial stages of all existing or anticipated judicial or administrative actions, hearings, investigations, cases, controversies, or similar proceedings, including grand jury proceedings, before courts, agencies, commissions, boards or other tribunals, foreign and domestic, or all legislative proceedings pending before any state or local body or agency, other than those specified in § 810.40(b).

"Request" is defined as:

An order, subpoena, or other demand of a court, or administrative or other authority, of competent jurisdiction, under color of law, or any other request by whatever method, for the production, disclosure, or release of information or records by the federal judiciary, or for the appearance and testimony of federal judicial personnel as witnesses as to matters arising out of the performance of their official duties, in legal proceedings. This definition includes requests for voluntary production or testimony in the absence of any legal process.

And "testimony" means:

Any written or oral statement in any form by a witness arising out of the performance of the witness' official duties, including personal appearances and statements in court or at a hearing or trial, depositions, answers to interrogatories, affidavits, declarations, interviews, telephonic, televised, or videotaped remarks, or any other response during discovery or similar proceedings that would involve more than production of documents.

Judicial personnel may not provide testimony in legal proceedings without the prior approval of a "determining officer." See *Guide* at § 840(a). In relevant part, the Guide provides the definition of "determining officer" as follows:

(b) The determining officer authorized to make determinations under these regulations will be as follows:
(1) In the case of a request directed to a federal court of appeals judge, district judge, Court of International Trade judge, Court of Federal Claims judge, bankruptcy judge, or magistrate judge, or directed to a current or former member of such a judge's personal staff (such as a judge's secretary, law clerk), the determining officer will be the federal court of appeals judge, district judge, Court of International Trade judge, Court of Federal Claims judge, bankruptcy judge, or magistrate judge himself or herself.

*Guide* at 840(b)(1).

3

The request as directed in the Notice is subject to the approval of the judge – in this case, Judge Charles M. Walker – as the determining officer.

The determining officer is authorized to determine whether the federal judicial personnel may be deposed, as well as whether federal judicial records may be produced, and "what, if any conditions will be imposed upon such interview, contact, testimony, or production of records." *Guide* at § 850(a). The determining officer may also deny a request if the request does not meet any requirement imposed by these regulations. *Guide* at § 850(a).

Section 850(a) requires the determining officer to consider the following factors when deciding the effect in the case, as well as future cases generally, which testifying or producing records will have on the ability of the federal judiciary or federal judicial personnel to perform their official duties. These factors are:

1. The need to avoid spending the resources of the United States for private purposes, to conserve the time of federal judicial personnel for the performance of official duties, and to minimize the federal judiciary's involvement in issues unrelated to its mission.

2. Whether the testimony or production of records would assist the federal judiciary in the performance of official duties.

3. Whether the testimony or production of records is necessary to prevent the perpetration of fraud or injustice in the case or matter in question.

4. Whether the request is unduly burdensome or is inappropriate under applicable court or administrative rules.

5. Whether the testimony or production of records is appropriate or necessary under the rules of procedure governing the case or matter in which the request arises, or under the relevant substantive law of privilege.

4

6.   Whether the request is within the proper authority of the party making it.

7.   Whether the request meets the requirements of these regulations.

8.   Whether the request was properly served under applicable court, administrative, or other rules.

9.   Whether the testimony or production of records would violate a statute, regulation, or ethical rule.

10.  Whether the testimony or production of records would disclose information regarding the exercise of judicial or quasi-judicial responsibilities by federal judicial personnel in the decisional or deliberative process.

11.  Whether the testimony or production of records would disclose confidential information from or pertaining to a presentence investigation report or pertaining to an individual's probation, parole, or supervised release, or would disclose any other information that is confidential under any applicable statute or regulation.

12.  Whether the testimony or production of records reasonably could be expected to result in the appearance of the federal judiciary favoring one litigant over another or endorsing or supporting a position advocated by a litigant.

13.  Whether the request seeks testimony, records or documents available from other sources.

14.  Whether the request seeks testimony of federal judicial personnel as expert witnesses.

15.  Whether the request seeks personnel files, records or documents pertaining to a current or former federal judicial officer or employee, and

          (A) the personnel files, records or documents sought by the request may be obtained from the current or former federal judicial officer or employee in question, or

5

(B) the personnel files, records or documents sought by the request would be made available to the requester with the written consent or authorization of the current or former federal judicial officer or employee in question.

16. Any other consideration that the determining officer designated in § 840(b) may consider germane to the decision.

As to the first consideration, the Court finds that the Notice serves no purpose other than to waste the resources of the United States for private purposes, and act to expend time of federal judicial personnel better used in the performance of official duties. Moreover, such involvement of the federal judiciary in issues unrelated to its mission serves no party and is a misuse of the resources available in order to avail oneself of the justice provided by the bankruptcy system.

Secondly, the Notice requests testimony that serves no purpose and has no relation to the merits of the case. Thirdly, the party seeking the testimony under the Notice – Manookian, PLLC - has alleged no specific instance of fraud or injustice. The request is inappropriate as the request for testimony from the sitting judge serves no purpose other than to taint the proceedings before the Court. The request is not appropriate or necessary under the rules of procedure or under substantive laws of privilege and is not within the proper authority of the party making the request.

Moreover, the Court, as determining officer, will not permit the testimony as requested because the Notice was not issued in accordance with the requirements established in the Guide. The Notice did not set forth, or contain an affidavit setting forth, an explanation of the nature of the testimony sought, the relevance of the testimony sought to the legal proceedings, and the reasons why the testimony sought, or the information contained therein, are not readily available from other sources or by other means. *Guide* at § 830(a). *U.S. v. Robinson*, 2018 WL 6322146, at *2 (S.D. Ohio Dec. 4, 2018). Furthermore, § 830(b) requires that the request be "provided to the

federal judicial personnel from whom testimony or production of records is sought at least fifteen (15) working days in advance of the time by which the testimony or production or records is to be required. Failure to meet this requirement will provide a sufficient basis for denial of the request." *Guide* at § 830(b). The request was not properly served under any applicable rules and such testimony would violate ethical rules as promulgated by the Judicial Conference and the Administrative Office of United States Courts. *Id*.

The request for testimony of the judge sitting on the case is sought in order to contaminate the exercise of judicial and quasi-judicial responsibilities by federal judicial personnel.

The eleventh factor is not applicable to these proceedings. For the twelfth and thirteenth factors, deposing the judge on a case is a manipulation of the judicial system in an effort to taint the proceedings. There is no expectation that any such testimony would serve any legitimate purpose.

The fourteenth and fifteenth factors are not applicable. As to the last factor, any other consideration that may be germane to the decision of this determining officer, it is important to note that the request to depose Judge Walker was made by a party that has made no specific accusation of bias linked to any ruling in the case. Moreover, two years after its inception, the case is merely at the discovery stage. No dispositive rulings have been issued. The request to depose the sitting judge has no basis in law or fact. Honoring such request would only serve to obstruct the justice administered through the bankruptcy system.

If, after considering the factors and the other requirements set forth in the Guide, the determining officer decides that the judicial personnel should not comply with the request, the judicial personnel should notify the requester of the Guide's procedures and respectfully decline to comply with the request. *Guide* at § 850(b). As the determining officer, having considered all

compulsory factors and other requirements set forth in the Guide, and after such deliberate consideration, it is my determination that, for the reasons stated above, the Notice is quashed and this Order serves as notice pursuant to the Guide at § 850(b).

    Therefore, the Notice is hereby quashed as inappropriate and unenforceable pursuant to the findings made above and the requirements of the Guide.

**THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS
INDICATED AT THE TOP OF THE FIRST PAGE**

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

8

# EXHIBIT 1

```
              UNITED STATES BANKRUPTCY COURT
            MIDDLE DISTRICT OF TENNESSEE (NASHVILLE)


IN RE:                        .    Case No. 19-07235
                              .    Chapter 7
CUMMINGS MANOOKIAN, PLLC,     .
                              .
                              .
                Debtor.       .
                              .
. . . . . . . . . . . . . . . .
                              .
JEANNE ANN BURTON,            .    Adv. No. 20-90002
                              .
                Plaintiff,    .
                              .
      v.                      .
                              .
HAGH LAW, PLLC, et al.,       .    701 Broadway
                              .    Nashville, TN 37203
                Defendants.   .
                              .    Thursday, March 17, 2022
. . . . . . . . . . . . . . . .    8:48 a.m.


        TRANSCRIPT OF PRETRIAL CONFERENCE AND MOTION HEARING
              BEFORE THE HONORABLE CHARLES M. WALKER
               UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

 For the Plaintiff:        Thompson Burton PLLC
                           By:  PHILLIP G. YOUNG, ESQ.
                           One Franklin Park
                           6100 Tower Circle, Suite 200
                           Franklin, TN 37067
                           (615) 465-6008



 APPEARANCES CONTINUED.



 Audio Operator:           Tanja Brewer, ECR



 Transcription Company:    Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46048
                           (855) 873-2223
                           www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
 transcript produced by transcription service.
```

APPEARANCES (Continued):                                    2


```
For Hagh Law PLLC and    Bass, Berry & Sims PLC
Afsoon Hagh:             By:  CRAIG VERNON GABBERT, JR., ESQ.
                         150 Third Avenue South, Suite 2800
                         Nashville, TN 37201
                         (615) 742-6277

For Manookian PLLC:      Spragens Law PLLC
                         By:  JOHN T. SPRAGENS, ESQ.
                         311 22nd Avenue North
                         Nashville, TN 37203
                         (615) 983-8900
```

1          (Proceedings commenced at 8:48 a.m.)

2                    THE CLERK:  All rise.  The United States Bankruptcy

3     Court for the Middle District of Tennessee is now in session,

4     the Honorable Charles M. Walker presiding.

5                    THE COURT:  Good morning.  Please take your seats.

6                    THE CLERK:  Your Honor, we're here on Case Number

7     20-90002, Burton v. Hagh Law, PLLC.

8                    There's several matters set.  There's a pretrial

9     conference, motion to compel discovery responses from Manookian

10    PLLC.  We have a motion and notice to compel discovery

11    responses from Hagh Law, PLLC, a motion and notice to compel

12    discovery responses from Afsoon Hagh.  Also set this morning is

13    Manookian, PLLC's motion and notice to compel Trustee Jeanne

14    Burton, to respond to interrogatories, Manookian PLLC's motion

15    for the Court to determine sufficiency of plaintiff's responses

16    to request for admission, or alternatively to be deemed

17    admitted.  And the last matter is motion and notice to compel

18    Marty Fitzgerald to comply with subpoena for production of

19    documents.

20                   THE COURT:  All right.  Thank you.

21                   Obviously, with that long laundry list of discovery

22    related matters that we're here to resolve, as promised, we're

23    going to be resolving all of them today.

24                   And if it gets hot in here, so be it.  There's

25    something wrong with the air, so if it gets warm in here, too

1  bad.

2          We have a hard break at 10:45 today.  We'll recess

3  from 10:45 to 2 p.m.  And at 2 pm., we'll come back and resolve

4  anything, if necessary, that remains.  And we will stay until

5  everything's resolved.

6          Obviously, with the many provisions within the Rules

7  of Evidence deemed in making discovery easy, it's the

8  responsibility of good lawyers to resolve discovery.  For us to

9  be here on such a list means that somewhere someone has failed.

10 So part of what I want to do today, I will be assessing who may

11 be responsible, or how many parties may be responsible, for

12 this breakdown in what typically is an orderly discovery

13 process.  And rather than let the secured creditors pay, if

14 it's one of the other parties, they'll pay.  Or the Trustee may

15 pay.  It all depends on who is responsible for this breakdown

16 in what, in my years on the bench, I don't think I've ever seen

17 quite the mess with discovery on what is not a complicated

18 case, and a case involving lawyers, which even makes it more

19 frustrating that we're here today.  That all these good lawyers

20 in the room, and all of the parties are either lawyers or law

21 firms, and the fact that this is Bankruptcy Court where we

22 typically resolve things, because there are limited funds and

23 everyone knows that.

24          So I'm a little discouraged to be here today.  I'll

25 just put it that way.

1          So, Mr. Young, let's get started.  We're going line

2    by line.  Tell me what's remaining and the Court will rule

3    accordingly.

4          MR. YOUNG:  Yes, Your Honor.  And I'm happy to --

5    I'll put the screen up where it's appropriate, but I'd like to

6    just sort of talk globally a little bit if I can first.

7          THE COURT:  Okay.

8          MR. YOUNG:  I think on Tuesday afternoon, we filed a

9    report so that hopefully the Court was not coming in completely

10   cold.

11          THE COURT:  Right.  And just one note on the status

12   report.  Is everyone in agreement that the status report

13   contains all of the outstanding discovery issues?  That there

14   are no other issues that need to be discussed today?

15          MR. GABBERT:  The ones related to Hagh Law are fairly

16   specific and, basically, I think we respond to most of those

17   already.

18          THE COURT:  All right.

19          MR. YOUNG:  And that's, I guess that's the point.

20   That's why I filed the status report is, from the Trustee's

21   perspective, it's a fairly finite set of documents that we're

22   still looking for, and I'm happy to go through those.

23          If the Court will, I'd like to start, though, with

24   the Fitzgerald subpoena, because that's perhaps the easiest.

25          We issued a subpoena to Marty Fitzgerald, who's a

1 third party.  It was issued December 9th, served December 13th.

2 I assume Hagh emailed an objection on December 27th, said other

3 counsel would contact us.  We didn't get any other kind of

4 objection.

5          Mr. Spragens indicated to the Court last time that he

6 thought he could coordinate Mr. Fitzgerald's response, though

7 not making clear that he was not representing Mr. Fitzgerald,

8 so I'm not trying to hold him to that.

9          But we've received nothing.  Those documents were a

10 finite set of documents, just as the Court knows.  And I want

11 to explain what they are and why they're important.

12          What we sought there were any kind of communications

13 involving engagement or disengagement of Cummings Manookian,

14 Manookian, PLLC, Hagh Law, PLLC, Afsoon Hagh, or Brian

15 Manookian.  We've received from Mr. Manookian an engagement

16 letter from Cummings Manookian.  We've received from Mr.

17 Manookian, a letter that he purportedly sent to Mr. Fitzgerald

18 notifying him that he'd have to get other counsel.  I don't

19 know, frankly, whether that was delivered, whether that letter

20 was delivered or not.  And that was part of the reason that we

21 were seeking to see what Mr. Fitzgerald had in his files.  And

22 there's been some reference to a Hagh Law engagement letter

23 with the Fitzgeralds which we've not seen.

24          And so that's the purpose of the subpoena.  I tried

25 to keep it, he's a third party, he's not really involved in

1  this.  I tried to keep it as finite as possible, as easy to

2  respond to as possible.  It should just be a handful of

3  documents, but I've received nothing.  And so we just ask the

4  Court to compel responses to that subpoena.

5           THE COURT:  Granted.

6           MR. SPRAGENS:  Your Honor, would you like an update

7  on the status of that?

8           THE COURT:  Yes.  Sure.

9           MR. SPRAGENS:  As Mr. Young knows, I was out of town

10  until yesterday evening, and I inquired about that when I got

11  back, and I'm told that Mr. Fitzgerald will be providing

12  documents to me by tomorrow.  I would like an opportunity to

13  look at them because I think that there may be attorney-client

14  communications in the documents that he provides.  But then I'm

15  prepared to turn over whatever is given to me early next week.

16           THE COURT:  All right.

17           MR. SPRAGENS:  So I just wanted the Court to know

18  that I've looked into that matter.

19           THE COURT:  All right.  And one thing, let's go ahead

20  and get appearances.  I kind of jumped into this before we got

21  to the basics.

22           So, if I can start on this side and work across the

23  room?

24           MR. YOUNG:  Yes, Your Honor.  Phillip Young, and

25  Jeanne Burton is with me, here on behalf of the Trustee.

1          MR. SPRAGENS:  John Spragens on behalf of Manookian,

2  PLLC.

3          MR. GABBERT:  Craig Gabbert on behalf of Afsoon Hagh,

4  Hagh Law, Bass, Berry & Sims.

5          THE COURT:  All right.  Thank you.

6          For the Fitzgerald subpoena the Court will grant the

7  relief with the condition that any production be provided no

8  later than the 25th.  That will give Mr. Spragens adequate time

9  to review.  And based on the representations of Counsel, please

10  add that to the order, that it specifically requires the

11  turnover in production of the requested documents to the

12  Trustee, Trustee's counsel, no later than March 25th.

13          MR. YOUNG:  Thank you, Your Honor.  I will.

14          The next matter I'd like to take up is the, if the

15  Court will, is the motion to compel against Manookian, PLLC.

16  There are actually only three remaining issues that we have and

17  I'll talk about them, and then if we need to bring them up I'll

18  bring them up on the screen.  I have them prepared.

19          But it's one interrogatory and two requests.  And

20  Manookian, PLLC did send us, on Tuesday, amended responses to

21  those.  And actually, I believe I attached that to my status

22  report, those amendments.  And those amendments did take care

23  of one of the four outstanding matters as of that time, but

24  there are still three outstanding matters and I tried to detail

25  the issues remaining in the status report.

1        The biggest one, Your Honor, is Interrogatory Number
2   5.  Interrogatory Number 5 asks, it has a list of particular
3   cases that Cummings Manookian had been involved in
4   pre-petition, and it asked Manookian, PLLC to say whether it
5   had an interest in the fees of any of those cases.  And if so,
6   state by dollar amount or percentage the interest in fees.
7        And we asked the same question of Hagh Law, and Hagh
8   Law answered that question correctly, the way we had asked.
9   But Manookian, PLLC has not responded to the question of the
10  dollar amount or percentage of the Fitzgerald or Shoemaker fees
11  to which it claims entitlement.
12       I want to explain to the Court why this question is
13  so critical to get an answer, because the answer so far has
14  essentially been, it's governed by -- it's governed by the
15  terms of some engagement letters and that's how it's going to
16  be decided, what percentage.
17       We need a percentage or a dollar amount for this
18  reason.  If Manookian, PLLC claims that they are entitled to
19  fees, to any portion of the fees, in either the Fitzgerald or
20  the Shoemaker case, that's inconsistent with the position
21  they've taken to this court so far.  That is that once a law
22  firm withdraws, it has waived its rights to fees.
23       So in that case, Mr. Manookian, when he was
24  suspended, withdrew in both of those cases.  So if they say
25  they are entitled to fees, there's an inconsistency.  If they

1 say they are entitled to no fees from either of those cases,

2 then I'm not sure they need to even be a party to this anymore,

3 because those are the only two remaining major assets of this

4 case.

5 And so either way, that's a significant outcome to

6 get a commitment in writing, not orally but in writing, as to

7 whether or not Manookian, PLLC claims an interest, a specific

8 interest, in those fees. That's why that question is so

9 important, and that's why we've kept pushing on that. It's why

10 I said that was the first and most important issue and that it

11 might moot all other issues as between the Trustee and

12 Manookian, PLLC.

13 So that's the only interrogatory that remains

14 unresponded to, or not satisfactory to the Trustee.

15 And then there are two other requests that we can get

16 to, but I'd like to deal with the interrogatory first, if the

17 Court will.

18 THE COURT: All right.

19 Mr. Spragens?

20 MR. SPRAGENS: Thank you, Your Honor.

21 As Your Honor probably saw in the correspondence that

22 was produced, well that was filed in support of the status

23 report, I have tried to figure out exactly the information that

24 Mr. Young has been looking for. I have tried to make a

25 representative of the firm available to talk to Mr. Young to

1 try to get answers to these questions.

2       With respect to this specific interrogatory, we have

3 produced the written agreement itself. I think that Federal

4 Rule of Civil Procedure 33(d) entitles us to produce documents

5 in response to interrogatories, documents that are maintained

6 in the course, the ordinary course of business.

7       There is a legal question that's at issue there, and

8 the Trustee can draw her own conclusions from the face of the

9 representation agreement about whether there is any entitlement

10 to fees, that the agreement does not claim any entitlement to

11 fees. And I think the document speaks for itself.

12       So we have responded to that interrogatory. We've

13 given them the source document now. And in my view, this is

14 sort of a "gotcha" attempt to try to set up a heads I win,

15 tails you lose, situation by the Trustee. In fact, we've just

16 given them the document and the Trustee can formulate its own

17 legal position about the document.

18       So in my view, we fully responded under 33(d).

19       THE COURT: Just as someone who's practiced with

20 lawyers, for lawyers not to know how much money they think

21 they're going to make seems a little, frankly, ridiculous. But

22 I see your position.

23       Mr. Young, did Hagh Law respond in a fashion that

24 would give you the information?

25       MR. YOUNG: No, Your Honor. Hagh Law, in response to

1  that same question, we asked the same question of Hagh Law, and

2  they actually gave a percentage that they say they're entitled

3  to.  So that I can understand.  I know what to do with that.

4        I'll note that Manookian, PLLC did produce one

5  agreement in the Shoemaker case.  It did not produce an

6  agreement related to Fitzgerald, but said that any right to

7  fees in Fitzgerald were defined in a Hagh Law engagement letter

8  with the Fitzgeralds, and we've not seen a Hagh Law engagement

9  letter with the Fitzgeralds.  So I don't know what to do with

10  that.  To say there's some document that's floating out there

11  that defines our interest, but we've not seen it, so I just, I

12  don't know what it to do with that.

13        MR. GABBERT:  Your Honor, with respect to the

14  Fitzgerald case -- do you mind if I stand here, or should I

15  come to the podium?

16        THE COURT:  You can --

17        MR. GABBERT:  With respect to the Fitzgerald case, we

18  responded we don't have a copy of any agreement.  But, you

19  know, we think that any -- it says, "Manookian PLLC's

20  entitlement, if any, to payment is governed by the specific

21  terms of a written agreement between the Fitzgeralds and Hage

22  Law.  Manookian, PLLC does not have a copy of the written

23  agreement."  So we've done our best to answer that one.

24    Obviously there's outstanding discovery to the

25  Fitzgeralds, maybe that will turn up what he's looking for.

1  Maybe Hage Law has documents, although my understanding is they

2  produced documents.

3         So, you know, I think the Fitzgerald question is

4  resolved, from our perspective.  We've given him what we have,

5  which is no written agreement.  And we've told him that we

6  looked and we don't have one.

7         With respect to the Shoemaker case, we've given him

8  the written agreement, and I think that that should resolve the

9  question.

10         MR. YOUNG:  And, Your Honor, just briefly.  That

11  resolves the request for production on that point.  What I'm

12  asking is whether or not they claim any entitlement to fee

13  based on any of that.

14         THE COURT:  All right.  What the Court's going to

15  order is a definitive statement from Manookian, PLLC as to any

16  percentage or dollar amount they believe they are owed, period.

17         Again, we're dealing with attorneys, attorneys know

18  how much money.  This is not a calculus question.  Provide the

19  information.

20         MR. YOUNG:  Thank you, Your Honor.

21         I'm ready to move on to the request for production,

22  if the Court's ready.

23         Request for Production Number 1 asked for any

24  documents that supported any affirmative defense or denial that

25  was set out in the answer.

1        And I understand the issue about that's awfully

2  broad.  I've tried to define that in subsequent pleadings to

3  say what I'm really looking for here is Manookian, PLLC, and

4  the other defendants as well, we'll get there, but Manookian,

5  PLLC has raised affirmatively that they have proof that would

6  disprove some of the -- some of the Trustee's allegations.  And

7  things that they've mentioned in the past were they had proof

8  by video or keyswipe information that showed that Afsoon Hagh

9  never went through the premises, the law office, after July of

10 2018.

11        They have documents showing that somebody other than

12 Cummings Manookian owned the furniture, equipment, telephone

13 number, website domain.  That they had documents concerning

14 Cummings Manookian's rights to use the premises, or not use the

15 premises, at 45 Music Square West.  And some, I guess, vague

16 illusion to time records for the cases, time records that the

17 lawyers may have kept.  If those exist, we need them.

18        If they can disprove that this is not -- we don't

19 want to go on a wild goose chase.  We want to narrow down what

20 the real issues are.  And if they can disprove the Trustee's

21 allegations, then, by all means, we'd like the evidence to

22 disprove that so that we can narrow this down.

23        Those issues that I just -- we don't really know what

24 we don't know, frankly, in this case.  But those are issues

25 that I've seen referenced in pleadings before.  And to the

1 extent that sort of information exist, we think the Trustee's

2 entitled to receive it now.  And if we're not, then, Your

3 Honor, we'd ask that the Court say what's not produced by a

4 certain date can't be used.  I think it's that simple with

5 regard to that.

6          If video really doesn't exist, or key fob information

7 really doesn't exist, that's fine.  If was just puffery or

8 whatever, that's fine.  We just don't want something to come up

9 later, well after discovery is closed, and we have to deal with

10 it at that time.

11          So that's what request Number 1 with regard to

12 Manookian, PLLC involves, and that's really all we're looking

13 for, Your Honor.

14          THE COURT:  Okay.

15          And, Mr. Spragens, Mr. Young has enumerated specific

16 items or documents.  What is your objection to providing what,

17 based off whatever conversations he's had with you, may or may

18 not exist?

19          MR. SPRAGENS:  Well, with respect to certain

20 information, like he asked about key fobs and swipes, you know,

21 what dates is he asking about, for example.  Because producing

22 here's -- let me tell you from my perspective what has happened

23 in this discovery process.

24          First of all, asking for all documents that support

25 your affirmative defenses is a very broad, extremely broad,

Case 3:23-ap-90004  Doc 161  Filed 05/08/24  Entered 05/08/24 22:30:19  Desc
Exhibit Hearing Transcript   Page 16 of 96

1  interrogatory.

2           THE COURT:  The Court agrees.

3           MR. SPRAGENS:  So that is a huge challenge for us to

4  respond to.

5           THE COURT:  Right.  There's no dispute with that.

6           MR. SPRAGENS:  Compounding that challenge is the fact

7  that the allegations in the complaint are sweeping allegations

8  about the conversion of property, the misuse of office

9  resources, furniture.  There's all this, you know, stuff in the

10  complaint, these very broad allegations.  And I think if you'll

11  indulge me just for a moment, what we have been trying to do in

12  discovery is understand the nature of those allegations so then

13  we could respond to them.

14           And we've tried it the formal way by saying, please

15  tell us what property are you talking about has been improperly

16  used by Hagh Law that is actually Cummings Manookian's

17  property, or has been used by Manookian, PLLC, that is actually

18  Cummings Manookinan's property.  On what dates was there access

19  to the premises at 45 Music Square West that was inappropriate?

20           So we're trying to get the information that is

21  underlying the allegations of the complaint so then we can

22  provide that information to the Trustee.  But as it stands

23  right now, just tell us everything about your involvement in

24  all these cases, that could turn up, you know, potentially

25  thousands of emails, a lot of which are attorney-client

1  privileged, and a lot of which are not relevant to the

2  allegations.

3        With respect to what property was used, what's our

4  defense.  We don't know what property they're saying was used

5  improperly.  So if it's that, you know, Ms. Hagh, or that

6  Cummings -- I mean, or that Manookian, PLLC was using 45 Music

7  Square West on certain dates, then we might be able to do a

8  search and respond to that.

9        And frankly, Your Honor, this is why I have offered,

10  time and time again, to make representatives of, you know,

11  Manookian, PLLC available to talk to Mr. Young so we can try to

12  figure out what's there and what exists and what is responsive

13  to their discovery requests.

14        But as it stands right now, they've made sweeping

15  allegations in the complaint.  They haven't told us much of

16  anything about the details behind those allegations.  I think,

17  as I've told the Court before, that those allegations couldn't

18  pass a Rule 9(b) scrutiny on these fraud allegations if we put

19  them to their burden.  But I just want to know what they're

20  asking for and we will make a good faith effort to respond.

21        I have never before offered to make a client

22  available to the attorney from the other side for effectively

23  an informal deposition, and I will do so here.  And I think the

24  fact that we're all lawyers, it would be a very productive

25  conversation, but he hasn't taken me up on that offer.

```
 1         So if he could help me respond, I would respond.  As
 2  it stands right now, it is extremely broad, sweeping discovery.
 3  And, you know, I can't go through every piece of property at 45
 4  Music Square West and talk about how it was acquired, on what
 5  date, who used it.  I'd like a little bit more clarity in order
 6  to respond.
 7         THE COURT:  All right.  What the Court's going to
 8  order on this one is, during our break I want the parties to
 9  confer.
10         Mr. Young, I want you to provide time ranges, details
11  about what property you believe might be at issue.  And based
12  off the enumerated list of things that you mentioned, Mr.
13  Spragens, I want you to then say, okay, between this date range
14  and that date range, if there are videos, if there's swipe
15  records, we will provide X, Y, Z.  All right?
16         So that's your homework for the break.  Because
17  again, this one seems fairly easy to resolve.
18         As you've already admitted, Mr. Young, your original
19  request was overly broad.  You have some basis based off
20  representations from Manookian, PLLC as to what might be
21  available.  So any items that are in that list, or similar, or
22  were available and known once you get this date range, like any
23  other piece of discovery that isn't turned over, you run the
24  peril of at trial you're not able to use it.
25         I'm not making any ruling one way or the other,
```

1 because I think it would be a very fact specific finding,

2 since, again, there is an unknown universe out there. But

3 obviously anything that was available and known that would meet

4 the request, once you get the date range and the specifics of

5 what property might be at issue, would be subject to being

6 excluded if you try to use it at trial.

7 　　　　So that one's an easy one to resolve, and I'll give

8 that as your homework for the break.

9 　　　　MR. GABBERT: And does the Court know what time March

10 madness tips off today?

11 　　　　THE COURT: No. But again, this is a painful day --

12 　　　　MR. GABBERT: I understand, Your Honor.

13 　　　　THE COURT: -- for all involved.

14 　　　　MR. YOUNG: Thank you, Your Honor.

15 　　　　The last issue with regard to Manookian, PLLC is

16 Request Number 8, which we were seeking documents and

17 correspondence related to the Fitzgerald case. Specifically

18 what we're looking for is any email communication with third

19 parties between Manookian, PLLC and any third parties.

20 　　　　I'm not looking for client confidentiality. I'm not

21 looking for that sort of thing. What we're trying to establish

22 here, the parties, both Manookian, PLLC and Hagh Law, have

23 claimed that they, and not Cummings Manookian, did all the

24 work. And so I think we can verify or deny that by seeing how

25 much work was done at different time periods by Manookian, PLLC

1  and by Hagh Law.

2          We've received no emails from Manookian, PLLC, and so

3  that's -- it's a finite universe and we're looking for emails

4  related to that case from Manookian, PLLC to any third parties,

5  not to clients, except to the extent that it's an engagement

6  communication, which we've already asked for.  But that's it on

7  Request Number 8.

8          THE COURT:  Okay.

9          MR. GABBERT:  Your Honor, on that one, which is, I

10 believe, Request Number 8, it requested all documents and

11 communications that relate or refer to the Fitzgerald case

12 including, but not limited to, correspondence between you and

13 counsel for the defendants in that matter.

14          What we have said is that it's a very broad universe

15 of documents.  It does include attorney-client privileged

16 documents.  It includes a lot of communications, frankly.  And

17 we said, if you can identify even general categories of

18 materials she wants, we will be happy to look for them.  But

19 right now, that is -- it is too broad.

20          So if what he is saying is, I'm looking only for

21 communications between Manookian, PLLC and opposing counsel or

22 third parties -- or I mean, I don't know what "third parties"

23 means, but if we can get some specificity, we will look and we

24 will try to produce those documents.  As it stands right now,

25 you know, it's thousands upon thousands of document requests.

1          THE COURT:  All right.

2          Mr. Young?

3          MR. YOUNG:  Yes, Your Honor.  I'll be as specific as

4   I can be.

5          What we are looking for are communications with

6   Defense Counsel, experts.  Anybody like that would not be

7   privileged.  I understand that there would be a number of

8   communications that are privileged.  We're looking for

9   non-privileged documents to establish whether or not, you know,

10  how involved Manookian, PLLC was in the trial of that case.

11         MR. GABBERT:  And, Your Honor, I would just note that

12  both of those categories could contain privileged

13  communications.  The expert communications, a lot of those

14  communications, may be privileged under the rules.  And when it

15  comes to correspondence with Defense Counsel, it depends on if

16  we're talking about negotiations towards settlement or not.

17         I know the Trustee has taken the position that

18  settlement negotiations are always completely protected, and

19  so, you know, we will look for those.  And if we have documents

20  that are responsive in those two categories that are

21  privileged, we'll produce a privilege log and he can evaluate.

22         MR. YOUNG:  And that's fine with me, Your Honor.

23         THE COURT:  All right.  Well, again, why are we here

24  on that one?  That should have been resolved amongst the

25  lawyers from day one.

1          So the Court will grant that request to make -- to
2    compel that production, because it is what it is.  And if there
3    are no responsive documents, there's no responsive documents.
4    Let's keep it moving.

5          MR. YOUNG:  Thank you, Your Honor.

6          That's all I have on the Manookian, PLLC motion to
7    compel.  If the Court would like me, I could take up the Hagh
8    Law and Hagh motions to compel next.

9          THE COURT:  Okay.

10          MR. YOUNG:  And those are related.  There's only one
11   distinction between those two, and I'll try to highlight that
12   first for the Court.  And then everything else -- everything
13   else is identical as between Hagh and Hagh Law.  The questions
14   were virtually identical, and the responses were virtually
15   identical.

16          The one exception, and this is Hagh Law Interrogatory
17   Number 8, and it asks to identify the basis for claiming the
18   percentages of interest that I referred to earlier in each
19   case.  And this is actually a pretty finite question here,
20   because there have been -- there have been engagement letters
21   produced that were between Cummings Manookian and the
22   Fitzgeralds, for example, and Cummings Manookian and the
23   Shoemaker plaintiffs.  And then there was one that was
24   Manookian, PLLC and the Shoemaker plaintiffs.  And then there
25   was one that was a much later one that was Hagh Law and the

1 Shoemaker plaintiffs.

2         What I would like in response to Interrogatory Number

3 8 is for Hagh Law to identify, by date and party, the

4 engagement letters it claims that -- the claims that gives it a

5 right to fees in Fitzgerald and Shoemaker.

6         So for example, if Hage Law is taking the position

7 that the Cummings Manookian engagement letter with the

8 Fitzgeralds is what gives rise to its claim for fees, I just

9 want to know that so that we know we have that document.  If

10 there's another document out there that they think gives rise

11 to the claim for fees, I just want to know what that document

12 is to know whether we have it or not.  Because, right now,

13 it's very difficult for me to ascertain.

14         So, for example, the only one I have in Fitzgerald so

15 far is an engagement letter between Cummings Manookian and the

16 Fitzgeralds.  And so I don't know if that's the engagement

17 letter upon which they base their client for a fee, or if

18 there's another one out there.

19         And so I'm looking just specifically for an

20 identification by date and party of the engagement letters that

21 they believe gives rise to a claim for fees in Fitzgerald and

22 Shoemaker, just in those two cases.  And that would resolve the

23 issue with Interrogatory Number 8 as to Hagh Law.

24         THE COURT:  Okay.

25         Mr. Gabbert?

1          MR. GABBERT:  Well, I think we sent seven -- we

2    resent six letters regarding fees this morning.  One of them I

3    think is on Manookian letterhead, but it says the attorneys are

4    Manookian and Hagh Law.  And I think I've sent that before, but

5    clearly that gives Hagh Law all the right to fees.  But, you

6    know, they're there, and she did all the work.

7          And Manookian couldn't get a fee because Manookian

8    didn't have a license, and she continued to represent all of

9    these plaintiffs and basically got the cases to conclusion.

10   And whether she had a fee agreement or not, quite frankly,

11   Manookian can't get a fee, Manookian has no license, and she

12   basically did all the work.

13          And we've already agreed, I agreed this morning -- my

14   client, I think you know, had a baby not too long ago, and

15   she's got the kids home on spring break this week.  Three kids.

16   I think the oldest may be 4.

17          But we've agreed to produce emails and everything

18   else by the Monday of the last week of the month.  I think it's

19   the 26th or 27th, or something like that.

20          But we produced the fee agreement.  I think we

21   produced them before, and I emailed them back to him again this

22   morning.

23          THE COURT:  All right.  So it's your understanding

24   there are no other agreements that would entitle Hagh Law to

25   fees?

1          MR. GABBERT:  Other than the ones I've sent him.

2          THE COURT:  All right.  So --

3          MR. GABBERT:  Well, wait a minute.  If she's doing

4   work on a case she's entitled to a fee.  Whatever agreement she

5   has, whether it's in writing or not, if she's working on a case

6   she's entitled to a fee.  She and the client may have done

7   that, and may have done it in writing, may have not done it in

8   writing, but that doesn't mean she's not entitled to a fee.

9          And Cummings, and Cummings Manookian, cannot get fees

10  because their named partner is disbarred, or basically, his

11  license is suspended.  And she didn't work for them, and she

12  never was a member of either one of those firms.  She had been

13  a contractor and she did work for them, but she was an

14  independent contractor.  But she was never a part of either one

15  of those firms.

16         So I don't know where he gets to that, quite frankly.

17  We'll talk about it another day.  That will be a legal issue.

18  But I think it's a fairly clear legal issue, based on what I

19  know as a as a prior disciplinary counselor, as well.

20         THE COURT:  Okay.

21         So, Mr. Young, it sounds like you've got the

22  information that is going to be responsive.  If you need to

23  actually pin it down with dates, I mean, Mr. Gabbert's

24  available right now.  During the break sit down and have him

25  answer any questions specific to the agreements.  And if

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

Case 8:2023-cv-90024-74  Doc 161ent 5Filed F05/057224/2Entered 05/05/23 27:20e19 #:Desc
Exhibit Hearing Transcript    Page 26 of 96

1  there's anything unanswered, he's available for you to ask, you

2  know, what does this really mean?

3         MR. YOUNG: Well, Your Honor, here's the -- I just

4  looked through what was sent. I had not looked through this

5  morning what was sent to me right before we started here, but I

6  just now looked through it. And again, herein lies the issue.

7  I received one Fitzgerald engagement agreement, and that's a

8  Cummings Manookian Fitzgerald letter, a Cummings Manookian

9  engagement letter with Fitzgerald.

10        If there are none, I just wanted something in writing

11  that says, there are no more. That's all we need in this case.

12  If this is it, if I've got the universe, a response to

13  Interrogatory Number 8 that says, you've now received

14  everything we have, is fine.

15        I just don't want to be facing a situation where

16  three months from now somebody finds another letter on a server

17  that hadn't been searched. That's what I'm trying to void,

18  because I was -- I was told that she was still looking through

19  another server.

20        And so if that's it, then a written statement that

21  says that is fine.

22        THE COURT: Okay. Well, I think Mr. Gabbert made

23  that representation in open Court.

24        MR. GABBERT: And this is just on the Fitzgerald

25  case, the question now that you're looking for?

 1           MR. YOUNG:  What's that?

 2           MR. GABBERT:  Just on the Fitzgerald case is all

 3 you're looking for?

 4           MR. YOUNG:  Yeah.  Unless there's -- I just want to

 5 know that we've received everything on Fitzgerald and Shoemaker

 6 that exists.  That's all I need.

 7           MR. GABBERT:  Well, you've, I mean, I sent you some

 8 on Shoemaker this morning.

 9           MR. YOUNG:  Yeah.  Yeah.  And I've seen that already

10 in the -- there was one for Cummings, or from Manookian, PLLC

11 and one for Hagh Law.

12           MR. GABBERT:  Well, the Manookian, PLLC lists Hagh

13 Law as a co-defendant.

14           MR. YOUNG:  Right.  I understand.  There's two of

15 them there, but --

16           MR. GABBERT:  Okay.

17           MR. YOUNG:  Right.  But just a statement that says we

18 received everything, is fine.

19           THE COURT:  All right.  So between now and when we

20 come back at two o'clock --

21           MR. GABBERT:  Well, I'm going to have to check with

22 my client on whether there's anything else on Fitzgerald other

23 than what I have here.  I'll confirm that.

24           THE COURT:  All right.

25           MR. YOUNG:  Yeah.  And that's why I just asked for

1  that in writing.

2          THE COURT:  All right.  I'll expect that confirmation

3  to be provided by two o'clock today.

4          MR. YOUNG:  Thank you, Your Honor.

5          The other issues are all requests for production, and

6  they apply equally to Hagh Law.  And I assume Hagh, the first

7  is Request Number 1, which is the exact same one we just went

8  through with regard to Manookian, PLLC.  That is, that is

9  whatever you've got to prove your affirmative defenses.  And I

10 would presume that we can work that out the same way the Court

11 told us to work out Request Number 1 with regard to Manookian,

12 PLLC.  So --

13         MR. GABBERT:  Well, on that one, Your Honor, please?

14 Hagh Law had no ownership or light lease or anything on the

15 agreement.  It has no access to anything related to the

16 building, on access to the building.  So that's an

17 inappropriate thing to ask Hage Law, because they did not

18 maintain offices in that building.

19         MR. YOUNG:  Your Honor, I just ask whatever they

20 have, just to --

21         THE COURT:  Right.  So your response is -- there's

22 your response, and you've responded accordingly.

23         MR. GABBERT:  We've responded.  Yeah.

24         THE COURT:  All right.

25         So anything else on that one, Mr. Young?

1              MR. YOUNG:  No.

2              THE COURT:  I think Mr. Gabbert stated clearly his

3  client's position.  And again, if something comes up later that

4  should have been known and should have been turned over, then

5  that's kind of how this works.  But based off of his

6  representation, if they had no ability or access to get videos

7  or swipe records or anything like that, then there's your

8  response.

9              MR. YOUNG:  Thank you, Your Honor.  That satisfies

10  me.

11              Request Number 3, copies of all engagement letters.

12  This is the same issue that we just talked about before.  And I

13  understand this will be resolved the same way, which is a

14  statement that says we produced all engagement letters that we

15  have, is fine.  I just don't want -- again, I just don't want

16  to find out later that there's another engagement letter that

17  we didn't know and we've chased the case this way only to find

18  out that there's something else out there.  So the same issue

19  as to Interrogatory Number 8 with regard to Request Number 3.

20  And I assume we'll handle that the same way?

21              THE COURT:  Yes.

22              MR. YOUNG:  Request Number 5.  And this is somewhat

23  related.  It asks for any document that supports its claims to

24  fees.  Again, that's going to be -- I assume that's going to be

25  the engagement letters.  But if there are anything else, like

1  time records, I've seen some reference to time records, if any

2  of the parties have, if Afsoon Hagh or Hagh Law have time

3  records I think that would be responsive to Request Number 5.

4          I've received none.  I don't know whether that means

5  there are none, but I just want to get that on the record that

6  if there are time records, we want them turned over.  Because

7  I've seen some reference to them, but we've not gotten

8  anything.

9          So I don't know if Mr. Gabbert knows whether his

10  client has time records or not, but --

11          MR. GABBERT:  These cases were contingent cases. Time

12  was not an issue.

13          MR. YOUNG:  Fair enough.

14          And, Your Honor, the reason I bring that up is

15  because obviously there are two ways to get a fee.  One is by a

16  written engagement letter, and one is by equity.  And time

17  factors into an equitable analysis, which is why I've asked for

18  that question.

19          THE COURT:  All right.

20          MR. YOUNG:  But if there are none, we'll consider

21  that resolved.

22          THE COURT:  All right.

23          MR. YOUNG:  Request Number 8.  And this is what Mr.

24  Gabbert just alluded to, and he did send me an email last night

25  that said that they would produce any email correspondence

1  related to Fitzgerald or Shoemaker by that date that he

2  mentioned.

3           MR. GABBERT:  The 28th.

4           MR. YOUNG:  And so if we could just incorporate that

5  in an order?

6           THE COURT:  Please.  And put that date, the 28th, or

7  whatever was agreed, between the two of you.

8           MR. YOUNG:  That resolves the Trustee's issues.

9  Those are the only issues the Trustee had regarding outstanding

10  discovery.

11           THE COURT:  All right.

12           Mr. Spragens.

13           MR. SPRAGENS:  See if I can use the technology

14  without showing you my brackets.  All right.  Are you able to

15  see that, Your Honor?

16           THE COURT:  I can.

17           MR. SPRAGENS:  Okay.  We may not need to refer to it,

18  but I at least wanted to have it there.

19           As Your Honor is aware, this action was filed two

20  years ago, over two years ago.  There was a motion for turnover

21  expedited, there have been a lot of proceedings over the last

22  two years.  A year ago, we propounded this written discovery,

23  in January of 2021.

24           And sorry, I jinxed it.

25           And our motion deals with the fact that the Trustee

1   has still not been able to give us, even, responses to our

2   interrogatories, which are really taking the allegations in the

3   complaint and saying, what information do you have to back up

4   this allegation, or that allegation?  Questions like:  What

5   assets are you alleging were converted or fraudulently

6   converted?  What property are you alleging was misused, and

7   when?

8           And the Trustee's responses to each and every one of

9   these, we now have some amended responses to our

10  interrogatories, basically are, you know, you have the

11  information.  We don't have the information.  But there's

12  really no, there's no final statement that we don't know it's

13  the statements are -- they're very boiler plate objections,

14  Your Honor.

15          So I'm happy to go through each interrogatory one by

16  one and discuss them.  We have made repeated attempts to try to

17  get this information from the Trustee and we've met with

18  resistance every time.  So now we have essentially all of our

19  interrogatories that we've propounded, we haven't been given

20  the amount of damages that are being sought here, or how the

21  Trustee views damages.  What is the trustee's calculation of

22  damages?  We haven't been given the property, the assets that

23  were converted.  We haven't been given an itemization of the

24  real estate at the time that the real estate was improperly

25  used.

1    And so that's what our discovery is seeking.  Our

2  motion, which is docketed at 104, goes through each one and

3  lays out why we view the responses as deficient.  And I'm happy

4  to walk through each and every one with Your Honor.

5    I think once we get some guidance from the Court it

6  would be -- you know, that might help us meet and confer, which

7  we should have been able to do by now, I would think, and get

8  this resolved.

9    But it cannot be the case that the Trustee is allowed

10  to just make all these allegations, which sound like fraud and

11  are very specific and detailed, and then refuse to answer

12  discovery about, okay, well, what's the basis of these

13  allegations.  I would submit that we wouldn't have some of

14  these other issues with discovery that we've been talking about

15  this morning if we had gotten some basic information in

16  response to our interrogatories.

17    So, you know, if the Court would like, I could go

18  through these one by one.

19    THE COURT:  That's what we said we're going to do

20  today.  So start with Number 1.

21    MR. SPRAGENS:  All right.  Thank you, Your Honor.

22    Number 1 asks for case names of every previously

23  pending legal action in which Cummings Manookian withdrew,

24  terminated their representation, or stopped providing legal

25  services to any client from January 1st, 2018 to the present.

1          In other words, we are trying to find out in which

2   cases the Trustee's view as that the Cummings Manookian

3   withdrew.  The Trustee objected and refused to provide

4   information in response to that, other than citing a letter

5   that was sent to the Fitzgerald plaintiffs about notice of

6   withdrawal.

7          If that is the trustee's full response to

8   Interrogatory 1, and the Trustee is not going to be able to

9   supplement it, that's fine.  But I think the interrogatory

10  response needs to say that this is all we know.  Instead, it

11  says, this calls for information we're still seeking in

12  discovery.

13          So with each of these we're caught in this cycle of,

14  we ask a question and the response is, well, we don't know, you

15  tell us.  So that's our view on Interrogatory 1.

16          THE COURT:  So if I understand, Cummings Manookian

17  knows what cases and clients they were involved and during that

18  date range, knows when they withdrew, or if they withdrew, and

19  you want the Trustee, who stepped in the shoes with not all the

20  books and records, and certainly not all the information and

21  the knowledge of this, to answer that interrogatory?

22          MR. SPRAGENS:  I want the Trustee to answer what the

23  Trustee knew at the time she made these allegations in the

24  adversary proceeding.  And I think that's reasonable.  I don't

25  think you're entitled to make allegations of fraud in an

1  adversary proceeding, or any federal lawsuit for that matter,
2  and then say, well, I don't actually, I don't know the answer.
3  They just alleged fraud upon information and belief.  I don't
4  think that is how it works.
5          I understand that bankruptcy is a different universe
6  and, one, frankly, as the Court knows, that I don't practice in
7  very often, but I still don't think the Trustee is entitled to
8  just say, I don't know what the basis for these allegations
9  was.  But if that's the answer, the Trustee needs to say so.
10          THE COURT:  Okay.
11          Mr. Young?
12          MR. YOUNG:  I'm happy to address this one, Your
13  Honor, and I'm going to address it sort of in a global way.
14          As I think the Court knows, trustees have no
15  firsthand knowledge.  Trustees come into a case cold and they
16  learn what they can get from third parties, from the debtor,
17  from defendants, from creditors, from whomever like that.  And
18  in this case it's been incredibly challenging because nobody
19  will turn over the information without Court orders.
20          And even after Court orders, they still don't turn
21  over the information.  In the case of the Cummings Manookian
22  motion to compel that was entered a year-and-a-half ago, still
23  haven't gotten most of that information.
24          And so the complaint, as the Court may recall, Mr.
25  Manookian wanted the complaint filed by a certain date.  We

1  filed that complaint based on facts and reasonable inferences.

2  That's what the -- that's what the law allows, facts and

3  reasonable inferences.

4          We have a handful of facts.  We have stated where we

5  have facts.  Those facts, frankly, mostly come from pleadings,

6  and the few relevant documents that we've gotten from the

7  defendants and from Cummings Manookian, but a lot of it have

8  come from pleadings in other cases.  Everything else, at this

9  point, is just an assumption, really, based on the facts.  And

10  we've stated that where that's been the case.

11          It is a little bit like a game of hide the ball where

12  then the trustee's criticized for not knowing the color of the

13  ball that's being hidden.  We are doing the best we can to

14  respond.  After discovery I'm sure we can respond more fully,

15  and we will respond more fully, once we get all this

16  information.

17          But essentially, as the Court's noted, the parties

18  are asking us for information that's within their exclusive

19  control, that in a lot of respects they've withheld from the

20  Trustee, and then criticizing the Trustee because she doesn't

21  know information that's been withheld from her.

22          And I think the Court will -- if the Court will look

23  through our responses, you'll see that we filed objections, and

24  that in almost every case we said, notwithstanding the

25  objection, here's the best we know how to answer it at this

1  time.

2          I've never, I've represented trustee's for over 15

3  years, I've never gotten this sort of discovery to a trustee

4  because everybody understands the knowledge limitations of a

5  trustee, that a trustee goes out and gathers information, not

6  disperses information.  So I don't know what to say about it,

7  other than that.

8          But I think that our responses are very fair.  I

9  think that they're very complete under the circumstances.  If

10 there's something that we legitimately don't think is an issue,

11 we've said so.  If there is information that we have or

12 assumptions we're making, we've said so.

13         And so I don't really know how to better answer this.

14 I really tried.  I took the Court's admonition to heart.  The

15 Trustee and I spent a lot of time going back through these to

16 say, is there anything we can refine in these answers?  And

17 we've done that to the best of our ability.  But unfortunately,

18 we're still very early in discovery in this case.

19 Unfortunately, that's where we are.

20         And so until there's been some more thorough

21 discovery we can't possibly answer questions like -- and we'll

22 talk about this in a minute, but we just got another 86 request

23 for admission filed since the last -- served since the last

24 hearing that ask things like:  Admit that this engagement

25 letter is the authentic version.

1          The Trustee wasn't the author of that.  She wasn't

2     there when it was signed.  The only way she knows whether

3     something's authentic is whether the parties to that agreement

4     tell her it's authentic.  That's just one example, but there's

5     a 100 examples along those same lines.

6          So that's our frustration in this case, and those are

7     our limitations.  And if we need to handle this differently,

8     Your Honor, we're happy to.  But we think that we've handled it

9     appropriately and done the best job that we could do as a

10    fiduciary to the estate.

11          MR. SPRAGENS:  Your Honor, respectfully, two points

12    in response to that.  You know, one is that fraud must be pled

13    with particularity, and I don't care who pleads fraud, I don't

14    care if it's a trustee or a plaintiff, personal injury

15    plaintiff, whatever, you have to plead it with particularity.

16    And when I ask for the particulars of your allegations of

17    fraud, which is what Interrogatory Number 5 asks for, you know,

18    what are the fraudulent actions that you have identified, you

19    know, time, place, date, give us the who, what, where, when,

20    why of the fraud, the Trustee says I don't have that

21    information.

22          Well, that is a pleading requirement for fraud.  And

23    if the Trustee doesn't have that information, the Trustee needs

24    to say, I didn't know that at the time I filed it.  I mean, the

25    representation today that these allegations in the adversary

1 proceeding are based on, quote, "assumptions and inferences,"

2 frankly, doesn't satisfy Rule 9 or Rule 8, I would submit, or

3 Rule 11 for that matter.

4 However, when we ask for things like what furnishings

5 or equipment are you saying were converted by Manookian, PLLC

6 or Hagh Law, we don't get any response. But it would be useful

7 to know what we're accused of so then we can respond to it.

8 And, you know, I'm sympathetic to the fact that the

9 Trustee doesn't have all the information.

10 The other thing I would like to point out again is

11 that I have offered on multiple occasions to make a

12 representative, and specifically Mr. Manookian, available for

13 Mr. Young to talk to. So if he wants to talk about, okay, you

14 know, I don't really know what property was there, tell me

15 about the desks and the office, tell me about the file

16 cabinets, tell me about the alarm system, we could have had

17 that conversation. Instead, we are handcuffed by the discovery

18 process where we're trying to find out what's the nature of the

19 allegations against Manookian, PLLC so we can respond to it.

20 And that is the nature of every interrogatory that we are

21 moving to compel further responses to.

22 And the idea that, you know, I don't have it and I'm

23 just going to say it's in your possession, or something like

24 that, we at least need a definitive statement of what they have

25 and don't have at this time. And at the time, frankly, two

1  years ago, when they brought this action.

2           I do have a separate issue to raise about the request

3  for admission, but, you know, for now, I'd like to talk about

4  the interrogatories.  And if we can go through other

5  categories, stealing telephone numbers, or email addresses.

6           Okay.  What telephone numbers or email addresses, I'm

7  referring to Interrogatory Number 10, are we being accused of

8  converting?  I think that's pretty basic, you know, based on

9  public records, I guess, pleadings.  As Mr. Young had said,

10  they should be able to respond to that.

11           When they talk about stealing client files,

12  Interrogatory Number 11, which client files are they saying

13  were improperly converted?

14           You know, when they talk about work on the Fitzgerald

15  case that's just, I mean, essentially that's been made up and

16  called an inference here, but we'd like to know if they have

17  any information about specific work that was done on the

18  Fitzgerald case that Manookian, PLLC is liable for in the

19  nature of fraudulent conversion or some other tortious

20  interference.

21           So, you know, each and every one of the allegations

22  that they made is a very serious allegation, and the fact that

23  the Trustee is the Trustee does not immunize her from complying

24  with Federal Rule 9 in the pleadings and then backing that up

25  in discovery.  So that's what we're asking for.

Case 3:20-ap-90024   Doc 161-5   Filed 05/05/22   Entered 05/05/22 20:14   Desc
Exhibit Hearing Transcript    Page 41 of 96

1        And if they don't have certain information, and they

2    didn't at the time that they filed the case, then that is the

3    appropriate response.  But just pointing the finger back at us,

4    in my view, doesn't satisfy their obligations under the rules.

5        THE COURT:  Well, under that analysis I can tell you

6    virtually every adversary proceeding that I've seen a trustee

7    file for preferences or any other thing would be thrown out

8    summarily by the Court under that standard, because the trustee

9    just doesn't have that information.

10        And your client filed this bankruptcy on behalf of --

11    or Mr. Manookian filed on behalf of Cummings Manookian, right?

12    There's a list of assets on the statements and schedules.

13    There's a list of cases and clients that are no -- that's in no

14    universe that Cummins Manookian has personal knowledge of.

15        The Trustee doesn't have personal knowledge of any of

16    this.  The Trustee is getting information from pleadings that

17    were filed under penalty of perjury and the discovery process

18    here.  So the Court understands your frustration if you're not

19    used to practicing in bankruptcy Court.

20        MR. SPRAGENS:  Sure, Your Honor.

21        THE COURT:  But this is not an IP case.  This is a

22    trustee who you got a complaint that was filed on a date

23    certain with the information available when it was filed.  And

24    you certainly had the ability to file a motion to dismiss, move

25    for summary judgment.  Whatever's available to you in the

Case 3:20-ap-90002 Doc 161-1 Filed 05/05/22 Entered 05/05/22 22:20:14 Desc
Exhibit Hearing Transcript    Page 42 of 96

1  litigation process is still available to you, based on if

2  you're not satisfied with the answers and you don't believe

3  that there's a cause of action that can be carried forward.

4         But to ask the Trustee to go and create something the

5  Trustee can't create is not possible.  And the Trustee doesn't

6  have personal knowledge, because it was the Debtor who created

7  the information and the circumstances.

8         MR. SPRAGENS:  I appreciate that, Your Honor.  If I

9  can just respond briefly?

10        To get from point A, which is filing your bankruptcy,

11 to point B, which was filing an adversary proceeding, including

12 a lot of serious allegations of fraud.  And as Your Honor

13 knows, this has some significant overlap with the receivership

14 action in State Court in Williamson County, and what we're

15 trying to figure out is how do we get from point A, which is a

16 bankruptcy with a schedule of debts and creditors and all that

17 stuff, to this very serious adversary preceding with these very

18 serious allegations, which are based on what?

19        And so I take your point, Your Honor.  We will avail

20 ourselves of the motion for summary judgment opportunity.

21 However, the Trustee is just going to come in and say, it's

22 premature because we can't respond to that.  So I'd at least

23 like to get some finality from the Trustee in terms of

24 discovery responses so then we can come in and file our motion.

25        THE COURT:  All right.  Well, let's do what we're

1  doing.  Let's go line by line and we will get finality while

2  all the parties are in the room.

3           MR. SPRAGENS:  Well, Your Honor, we had talked about

4  Interrogatory Number 1, which was the withdrawal dates for

5  Cummings Manookian, and what are the Trustee's allegations, or

6  what's the Trustee's information about Interrogatory Number 1.

7  I'm not sure that you've ruled on that one.

8           THE COURT:  The Court finds Trustee's response to be

9  acceptable.  And with the --

10          Mr. Young, is the Trustee in receipt of any

11  additional information based off of the subsequent items that

12  have been disclosed?

13          MR. YOUNG:  No, Your Honor.

14          THE COURT:  All right.

15          MR. SPRAGENS:  Interrogatory Number 2 relates to

16  Interrogatory Number 1, which is legal services after that

17  withdrawal date.  And essentially Trustee said, I didn't answer

18  1, so I'm not answering 2.

19          THE COURT:  And again, Mr. Young, you're now in

20  possession of various engagement letters that should encompass

21  the subsequent work by any other firms that are related to

22  these proceedings.  Do you have any responsive information in

23  addition to what has been given?

24          MR. YOUNG:  No, Your Honor.  Simply because there's a

25  we don't -- we have not been given anything that shows that

1  Cummings Manookian actually terminated its relationship with

2  anything.  So if it hasn't terminated as a relationship, then I

3  have nothing about what happened after a termination, so --

4            THE COURT:  Mr. Spragens?

5            MR. SPRAGENS:  I mean, in the response to Number 1,

6  there is the withdrawal letter in the Fitzgerald case.  So I

7  think that that would be one that they could respond to based

8  upon that.

9            THE COURT:  All right.

10            MR. YOUNG:  Your Honor, if I may address that?

11            A withdrawal letter doesn't mean that legal services

12  had stopped.  What has to happen is a withdrawal in the case,

13  and that didn't happen.  Cummings Manookian did not withdraw in

14  the case, and so --

15            THE COURT:  And here we go back to the argument of,

16  are you going to assert that you're owed money after the

17  withdrawal?  I mean, this thing is becoming a circular

18  argument.  Again, we're all lawyers here.  If that information

19  is necessary to prove a particular element of a cause of

20  action, it needs to be provided on what the Trustee is relying

21  on.

22            Now, it gets very circular in that we keep arguing

23  about, you know, is this the only agreement?  Was there

24  subsequent agreements?  The agreement stands for what it is.

25  At some point we just need to disclose the underlying, does

Case 3:20-ap-90004   Doc 161-5  Filed 05/05/22  Entered 05/05/22 22:20:14  Desc
Exhibit Hearing Transcript    Page 45 of 96

45

1  Cummings Manookian believe they're owed any money, and why.

2  Does the Trustee believe Cummings Manookian is owed any money,

3  and why.

4          I mean, that's the essence of what we're talking

5  about here.

6          MR. SPRAGENS:  And, Your Honor, and only the Trustee

7  can answer that question, because Cummings Manookian is not an

8  entity.  There's not even a lawyer associated with it.  So it

9  couldn't exist in the future, or right now, because Mr.

10  Manookian doesn't have a law license.

11          So, you know, the Trustee is the one who gets to make

12  that decision at this point.

13          THE COURT:  So I think that's the best way to frame

14  why we're here, right?  It's all about the money.  This is

15  Bankruptcy Court and every second we're here somebody's not

16  going to get a dollar, or in this case lots of dollars.

17  Because we're here talking about things that are obvious, and

18  should be for a bunch of lawyers who have resolved everybody

19  else's disputes for years and can't seem to get past the forest

20  for the trees on this dispute.

21          So let's keep going.

22          MR. SPRAGENS:  So Interrogatory Number 3 says, "If

23  the Trustee alleges that Cummings Manookian is entitled to

24  attorney's fees, or payment from Afsoon Hagh, Hagh Law, or

25  Manookian, PLLC, identify in which cases."

1          I mean, this is the theory of the case here, and so

2    that's all we're asking for.  And I, you know, I think that's a

3    reasonable thing to be requesting in your first set of

4    interrogatories.

5          MR. YOUNG:  And, Your Honor, if you'll look at the

6    response to Number 3, we did.  We cited every -- well, in the

7    amended responses we've actually cited the two remaining cases

8    to which are -- that are issues, and the dates that we

9    understand the start and we understand the stop.

10          But the questions about, you know, identify all

11   settlement offers obtained by Cummings Manookian, for example,

12   the Trustee has no way of knowing.  The Trustee hasn't been

13   given Cummings Manookian's case files.

14          You know, identify all legal work perform by Cummings

15   Manookian in the case such as research, drafting, number of

16   hours spent, there's no way for the Trustee to know that.  The

17   Trustee knows what cases, and the Trustee has done her best to

18   identify the start and stop dates.

19          THE COURT:  Okay.

20          MR. YOUNG:  The Trustee has come in and said that

21   Cummins Manookian is entitled to fees in these cases and we're

22   trying to figure out what's the basis for that allegation.  And

23   in fact, some of the cases, I mean, Cummins Manookian wasn't a

24   going concern during some of that time period, or at least --

25   and I haven't looked at these amended responses which just came

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

1 in earlier this week, but, you know, that's why we're trying to

2 find out what the Trustee's position is on this.

3 　　　　　And if the Trustee's position is, you know, we think

4 that Cummings Manookian is entitled to some fee, but we can't

5 tell you on what basis that, you know, theory travels, whether

6 it's quantum meruit, or there was a settlement offer that was

7 turned down, and so Cummings Manookian has some entitlement to

8 that, that's all we're trying to learn here.

9 　　　　　And now we have a list of two cases, and we've been

10 recently given an approximate start and stop date of Cummings

11 Manookian's involvement.  We still don't really know much about

12 why Cummings Manookian is entitled to a fee.

13 　　　　　MR. YOUNG:  Your Honor, I can answer that question

14 right now.  The complaint answers it.  The answer to that

15 question is, because there are engagement letters between

16 Cummings Manookian and these plaintiffs that establish a legal

17 right to the fee.  That's the answer to why Cummings Manookian

18 is entitled to a fee this case.

19 　　　　　THE COURT:  All right.  There's your answer.

20 　　　　　MR. SPRAGENS:  Okay.  Well, that's the Trustee's

21 position about the engagement letter, I guess.

22 　　　　　And the Trustee's position about withdrawal letters

23 is that they don't actually constitute withdrawals.  I mean,

24 we're learning, even today, about the theory of the case.  This

25 is not information that had been provided to me before today.

1          Number 4, ask for hours.  Again, same inquiry.  We're

2  just trying to find out what's the basis.

3          I assume the Trustee's answer is, we don't know how

4  many hours were worked by Cummings Manookian.  If that's the

5  answer, I would just like the Trustee to write that, rather

6  than objecting to what I think is a reasonable interrogatory.

7          THE COURT:  Mr. Young?

8          MR. YOUNG:  Your Honor, we don't know.  And we said

9  that we're still seeking discovery on that issue.  Maybe Mr.

10  Manookian knows that and will say something in his deposition.

11  I don't know.

12          THE COURT:  All right.

13          MR. YOUNG:  There's no way for the Trustee to know

14  that.

15          THE COURT:  When is Mr. Manookian's deposition?

16          MR. YOUNG:  It's not been scheduled, Your Honor.

17          THE COURT:  All right.  We're going to do that today,

18  by the way.

19          MR. SPRAGENS:  And I assume, also, the Trustee's

20  deposition and Mr. Young's deposition.

21          THE COURT:  We're going to -- we're going to -- we're

22  going to get all these discovery issues resolved.

23          It appears that all of these are ripe for further

24  discussion after the full and total depositions are taken.  And

25  at that point, any answers that are deemed unresponsive the

1  parties can confer.

2       Because it sounds like most of this is going to be

3  driven by additional information that's available, not to the

4  Trustee at this moment, but is locked away deep inside Mr.

5  Manookian's brain somewhere.  That while he's under oath he

6  will enlighten the Trustee and the other parties on exactly

7  what happened so that the Trustee does what trustees do all the

8  time, they amend complaints, they dismiss complaints.  They

9  move on if there's nothing there or it's not sustainable for

10  the original theory of the case based off of the original books

11  and records or whatever they used with the filing of the

12  pleading.

13       So that's kind of how this works.  And so for the

14  parties to resolve these, you need to work together with the

15  total discovery that Mr. Manookian holds the keys to the

16  kingdom.

17       MR. SPRAGENS:  Well, that's certainly the Trustee's

18  theory.

19       THE COURT:  It's not a theory, Mr. Spragens.  The

20  Trustee was not there.  The Trustee has no crystal ball.  The

21  Trustee steps in to save the estate for the benefit of

22  creditors based off the actions of the people who put it in

23  bankruptcy.

24       I don't know -- I don't know what you expect the

25  Trustee to come up with when the Trustee physically has no

1  personal knowledge and was not involved in any of the time
2  frames that you're seeking information.
3         MR. SPRAGENS:  Well, Your Honor, respectfully, I
4  mean, Number 5 is the next interrogatory.  That's the one about
5  fraud.  The Trustee made a bunch of allegations about fraud.
6         And so it's one thing to preserve an estate, and to
7  administer an estate, I certainly agree with Your Honor that
8  that's an important function.  But let's talk about the
9  adversary proceeding that we're here today on, which is the
10  Trustee made a bunch of allegations about false representations
11  or material omissions.  We've asked for more information about
12  those.  And again on Number 5 we get told, well, actually, you
13  know, we allege fraudulent transfers, but no fraudulent
14  representations or material omissions.
15         Can we get a little more information about that one?
16         THE COURT:  All right.
17         Mr. Young?
18         MR. YOUNG:  Your Honor, I don't know what to say
19  about that other than fraudulent transfers are not for all.
20  548 is not fraud.  That's a fraudulent transfer and it's
21  totally different.  And there are no material omissions, there
22  are no fraudulent misrepresentations, and we've said that.
23  We've said this is a 548 case, not a fraud case.
24         And so I don't know how to say that more clearly than
25  we've said that.

1       THE COURT:  And you're basing the fraudulent
2  transfers on what?
3       MR. YOUNG:  On transfers to or for the benefit of
4  another party for less than reasonably equivalent value at a
5  time that the estate was insolvent, or that the transfer made
6  the estate insolvent.  This is a pretty basic 548 argument,
7  Your Honor.
8       THE COURT:  Okay.
9       Mr. Spragens, with the limitation on its merely
10 transfers, what do you believe would be responsive beyond what
11 Mr. Young has represented is the Trustee's position?
12      MR. SPRAGENS:  Well, Your Honor, I think intentional
13 conversion of property falls into the nature of fraud.  I mean,
14 any sort of intentional misrepresentation that's being accused
15 in this complaint, which, I mean, the complaint is full of very
16 specific allegations -- well, I misstated that, but very --
17 well, let's say, allegations that Hagh Law or Manookian, PLLC
18 have taken premises, furniture, equipment, intellectual
19 property, attorney's fees.  I mean, have taken them, so this is
20 intentional misconduct, that's in the nature of a fraud.
21      And I can't speak to the Bankruptcy Code if the fraud
22 alleged here doesn't really mean a fraud, but the complaint is
23 full of allegations of conversion, and essentially theft, that
24 taking a property that one is not entitled to.
25      So we are asking:  What exactly are you alleging has

1  happened here?

2          And again, I think that's an appropriate inquiry.  If

3  you're a Trustee, or any other plaintiff, I think you should be

4  able to say, well, here's what we are alleging was taken, here

5  are the fees that we allege the law firm, Cummings Manookian,

6  is entitled to, that Manookian, PLLC, Afsoon Hagh, and Hagh Law

7  have essentially stolen.

8          MR. YOUNG:  And, Your Honor, we answered that in

9  response to Number 9, that question.

10         THE COURT:  What is your answer?

11         MR. YOUNG:  The question is, "Identify the office

12  space and specific furnishings and equipment you allege Brian

13  Manookian or Manookian, PLLC utilized in Paragraph 20 of your

14  complaint."

15         And the response is, "Premises located at 45 Music

16  Square West, Nashville, Tennessee, and all the furnishings,

17  equipment, and personal property located therein."

18         MR. SPRAGENS:  I don't know what furnishings or

19  equipment they're referring to.  I understand there --

20         THE COURT:  There are statements and schedules --

21         MR. SPRAGENS:  Uh-huh.

22         THE COURT:  -- that list everything that Cummings

23  Manookian owned.

24         MR. SPRAGENS:  And I don't think -- and I don't have

25  them in front of me, I don't think that those statements and

 1  schedules even refer to property inside 45 Music Square West.
 2  I don't think Cummings Manookian owned that property.  They
 3  didn't own 45 Music Square West, for starters.  And I don't
 4  think that they own the property inside 45 Music Square West.
 5          But if that's what this is based on, then that's
 6  great, Your Honor.  Can they just write that in their response
 7  to our interrogatory?  I'd love to -- I'd love to know.
 8          THE COURT:  Mr. Young, if you could amend --
 9          MR. YOUNG:  Your Honor, I read it verbatim out of our
10  responses.
11          THE COURT:  To Interrogatory Number 9.
12          MR. YOUNG:  Correct.
13          THE COURT:  All right.  So we're talking about Number
14  5.
15          MR. YOUNG:  But Number 5 asks for instances of fraud
16  that we're not alleging any material omission or false
17  representation, that is the question.  There are no allegations
18  of that.
19          MR. SPRAGENS:  You all can correct me if fraud means
20  something different in bankruptcy court than it does everywhere
21  else.  My understanding of the Bankruptcy Rules and the Rules
22  of Civil Procedure are that fraud must be alleged with
23  particularity.  And I don't think that the response to Number 9
24  is sufficient, either.  "Premises located at 45 Music Square
25  West and all furnishings, equipment, and personal property

1  therein."

2          So if he is not alleging that there was wrongful

3  conduct, or if the Trustee is not alleging that there was

4  wrongful conduct, the taking of property that was not -- that

5  Afsoon Hagh, Hagh Law, and Manookian, PLLC were not entitled

6  to, then I guess I've misunderstood the nature of the adversary

7  proceeding.  I think that this complaint includes very detailed

8  allegations of fraud.

9          THE COURT:  And here we go in another circle.  The

10 Trustee has made allegations based off information and belief

11 and the knowledge present when this was filed.  Mr. Young has

12 just articulated it's based on use, misuse, continued use,

13 whatever it ends up being or not, of the property that was at

14 the address that Cummings Manookian owned.  If they didn't own

15 anything, well, guess what?  You got a pretty easy defense.

16         MR. SPRAGENS:  I don't disagree, Your Honor.

17         THE COURT:  Right?  So what are we arguing about?

18         MR. SPRAGENS:  Well, I --

19         THE COURT:  I mean, you've got a pretty easy defense.

20 If you say, we don't own any property there.  Okay.

21         MR. SPRAGENS:  Well --

22         THE COURT:  Your witness will testify to such.  The

23 Trustee will take the list of anything there and say, okay,

24 here's what I got, do you own any of it?

25         MR. SPRAGENS:  But Your Honor understands that what I

1    don't want them to show up later and say is, oh, well,

2    actually, we've got this other property, or some other thing.

3    I mean, that's why I'm trying to find out, the nature of the

4    allegations.  And certainly when we get into depositions, which

5    we've been asking for for a long time --

6              THE COURT:  Well, but --

7              MR. SPRAGENS:  -- further light can be shed on some

8    of those questions.  But I want to know is there going to be

9    some other property that they're now going to say was misused

10   or converted?

11             THE COURT:  So the Trustee's bound by the property

12   that's in the bankruptcy estate.  It's listed on statements and

13   schedules.  There's no zinger here.  And if there is a zinger,

14   guess what?  It's subject to the same thing.  If the Trustee

15   knew, or should have known, and disclosed that, at this time

16   the Trustee's not going to be able to use that.

17             I mean, this is, we got a finite universe of what

18   could be.

19             MR. SPRAGENS:  And I appreciate that, Your Honor.

20   And I'm encouraged to hear you say that they are going to be

21   bound by these responses that are -- if they had information

22   that was available to them prior to this time.  And we're

23   relying on these responses as we prepare our defense of this

24   case --

25             THE COURT:  Right.

Case 3:20-ap-90004   Doc 161-1   Filed 05/05/22   Entered 05/05/22 20:14   Desc
Exhibit Hearing Transcript   Page 56 of 96

1          MR. SPRAGENS:  -- I appreciate that.

2          THE COURT:  And you should have known that from the

3    beginning.  I shouldn't have to reiterate that, that that's how

4    these rules work.  That's why there's rules, because discovery

5    is a pain in the side of everyone, and we've standardized the

6    practice and the process to ensure that there aren't zingers at

7    trial where one party holds back or then changes their story at

8    the end of the day.

9          MR. SPRAGENS:  Well, Your Honor, in my view, every

10   one of their responses includes a caveat that basically says,

11   if I learn something later, I might change what I'm saying.

12          THE COURT:  And that's how bankruptcy works.

13          MR. SPRAGENS:  I appreciate what you're saying.

14          THE COURT:  The Trustee doesn't have the information.

15          I mean, again, under that standard there would never

16   be a single adversary proceeding that would proceed in

17   bankruptcy.  Every company that files bankruptcy, and then the

18   Trustee who has a timeline where they have to file these

19   actions, no action would ever get through any litigation

20   because the Trustee doesn't -- the Trustee wasn't there.  The

21   Trustee doesn't have personal knowledge.

22          It's only through the discovery process that they

23   understand what happened.  So they're bound by their answers,

24   which is why the answers say, if we find something else out,

25   we'll include it.  And that's why Trustee's routinely drop

Case 3:02-ap-90004   Doc 161-15 Filed 05/05/22  Entered 05/05/22 22:04 #: 123c
Exhibit Hearing Transcript    Page 57 of 96

1  counts, add counts, you know, amend, dismiss the complaint

2  entirely, because that's how it works.

3          And that's why the collaboration here is different

4  from other places, because they don't have the information.

5  The Trustee is duty bound as a fiduciary to try to maximize the

6  value of the estate with a time certain that they have to

7  investigate and find what causes of action may or may not be

8  present.

9          So I'm hearing what you're saying, but by the same

10  token, the Trustee is doing what the Trustee does in cases, in

11  all cases.

12          MR. SPRAGENS:  I understand, Your Honor.

13          Here's one that maybe we could get a little light

14  shed on today.  Number 16 is, "Do you contend that Cummings

15  Manookian ever employed Afsoon Hagh?"

16          We just heard some conversation about that earlier on

17  the prior motion to compel.  So far, we've gotten an objection

18  and I don't know, can we supplement that based on the written

19  discovery that they've now acquired?

20          THE COURT:  Well, Mr. Young, that's a fair one,

21  right?  So is there any evidence or information that leads you

22  to believe that Ms. Hagh was ever an employee of Cummings

23  Manookian?

24          MR. YOUNG:  No, Your Honor.  We have no information

25  at this time to believe that.  But we've not seen -- we've not

Case 3:20-ap-90024   Doc 161-1  Filed 05/05/22  Entered 05/05/22 20:14  Desc
Exhibit Hearing Transcript    Page 58 of 96

1  seen the Debtor's employee records, we've not seen any bank

2  account records, we've not seen -- we've not seen anything.

3  So can I say that she's not an employee?  No.  But I also can't

4  say that she was never an employee.  We just don't know that.

5          I mean, we do know that she was acting as an agent,

6  because she signed pleadings on behalf of the firm and she was

7  listed as the point of contact on some of the invoices that

8  they've sent us.  So we do know she was acting as an agent, but

9  I have no idea -- we had no idea what the term of that agency

10  was.  It may have been an independent contractor, we just don't

11  know.

12          We do know she wasn't, and we said so, we do know

13  that she wasn't a partner.  We do know that.  But beyond that,

14  we don't know what the scope of her agency was.

15          MR. SPRAGENS:  I'm not sure how they are willing to

16  know that she wasn't a partner, but they're not willing to know

17  that she was an independent contractor, which we've now heard

18  Mr. Gabbert say here, and that the documents support that.

19          So again, from my perspective, representing, you

20  know, this entity, in this case, the allegations are made.  We

21  are guilty until proven innocent and, you know, he doesn't

22  accept the representations that he doesn't like, and he might

23  accept the ones that he does.

24          So it is a very tough situation to be in, in

25  discovery when we don't understand the basis for the

1 allegations and we don't understand why --

2         THE COURT: Well --

3         MR. SPRAGENS: -- you know, he'll agree that she's

4 not a partner, but he won't agree that she was an independent

5 contractor.

6         THE COURT: Again, unless I'm missing something, if

7 your position is she never worked for your client, pretty easy

8 defense if they make an allegation that she was, that she never

9 did, and here's the proof.

10         MR. SCHWARTZ: At what point, Your Honor, does Mr.

11 Young comment -- I mean, so let's just point out he said, well,

12 I don't have the time records, so I don't know. And we're

13 saying, there aren't time records, she wasn't an employee.

14         But he says Manookian, PLLC you're a fraudster and

15 you just haven't produced the time records. I mean, at some

16 point, this has to end and we get the benefit of --

17         THE COURT: Yeah.

18         MR. SPRAGENS: -- I mean, fulsome --

19         THE COURT: And again, you know, you've said a couple

20 things. You've used "fraud" a lot, and you talk about guilty

21 until proven innocent. Let's be realistic here, right? A

22 complaint is a complaint. It's not a judgment. It's not a

23 ruling by the Court. Every party gets to start off with what

24 they're alleging.

25         MR. SPRAGENS: Well, Your Honor, respectfully,

1　there's $750,000 that's been impounded now for how long?  Two

2　years.

3　　　　　　　THE COURT:  Which is exactly why we need to move on.

4　　　　　　　MR. SPRAGENS:  I appreciate that, Your Honor.  But

5　from my client's perspective, and I assume from Ms. Hagh's

6　perspective, you know, there has been a burden over these last

7　two years.  There have been very serious allegations made and

8　there has been money impounded and here we are still trying to

9　find out the nature of the allegations.

10　　　　　　So forgive me, please, Your Honor, if I seem a little

11　exasperated by this process where, as I say, it's heads I win,

12　tails you lose.  And we're here two years later, we've been

13　asking to take the Trustee's deposition for a long time to find

14　out some of this information, as well.

15　　　　　　THE COURT:  Well, again, your client either hired or

16　didn't hire Ms. Hagh as an attorney.  Your client knows that

17　information.

18　　　　　　MR. SPRAGENS:  Potentially.  I mean, Mr. Cummings was

19　also a principal of Cummings Manookian, and so, you know, that

20　might be another source of information for the Trustee.

21　　　　　　THE COURT:  Okay.  Well, in any event, again, it's an

22　easy defense to say, no, and here's why.

23　　　　　　MR. SPRAGENS:  I appreciate that, Your Honor.  As

24　long as they don't say, unless there's some other information

25　out there that we don't know.

1      THE COURT:  The information that would be either

2  provided by your client --

3      MR. SPRAGENS:  Uh-huh.

4      THE COURT:  -- Ms. Hagh, the law firms, the only

5  information they're going to get is information that you

6  provide.

7      MR. SPRAGENS:  Well, they have the ability to get

8  information from other sources, as well, including

9  Mr. Cummings.  They've now sought Mr. Fitzgerald, the client in

10  one of those matters, to produce information.  And so we're

11  just trying to find out what they have, what they know, and

12  what they're alleging.

13      For example, Number 18, economic damages, we've asked

14  what's the basis for your allegation, what damages do you claim

15  Cummings Manookian are owed?  And we are in the circular

16  situation again where they say, we don't know, entitled to some

17  damages.  And that's, again, what we're trying to find out.

18      And if the answer is, we don't know, we can't answer,

19  we don't have that information, then they should say that and

20  be bound by it, is my request, Your Honor.

21      THE COURT:  Okay.

22      MR. YOUNG:  Your Honor, we've answered that by saying

23  some or all of the fees and expenses collected in those cases,

24  that's the universe.  I don't know whether yet, because I

25  haven't finished discovery, whether the Trustee right now would

62

1  say the Trustee is entitled to 100 percent of the Fitzgerald

2  fees and 100 percent of what's remaining of the Shoemaker fees,

3  because we have a written engagement letter.  But they may have

4  proved that, hey, we added equitably and we're entitled to some

5  portion of that.

6         MR. SPRAGENS:  Well, again, it's good -- useful to

7  hear some of these things, to learn that the Trustee's position

8  is that she's entitled to 100 percent of those fees, not

9  withstanding the withdrawal letter that we talked about earlier

10  and all that stuff.  This is part of the discovery process.  I

11  agree, we shouldn't have to do it in front of the Court.

12         I would love to learn these things in discovery,

13  understand the nature of the allegations and the basis for

14  these, you know, assertions.

15         THE COURT:  All right.  So what I want to do on all

16  of these --

17         Mr. Gabbert, you look like you want say something.

18         MR. GABBERT:  I'm want to ask a -- I want put

19  something on the record before -- for the record, now I'd like

20  to say something first.

21         MR. SPRAGENS:  And, Your Honor, I also have -- the

22  RFA question can be resolved in one fell swoop, I think.  But I

23  don't mean to interrupt.

24         THE COURT:  All right.  Well, we've got about --

25  we've got about another 30 minutes before I was going to take a

1  break.  If you want to save it to the bitter end.

2          MR. GABBERT:  I can do it either way, Your Honor.

3          THE COURT:  All right.  Well, I want to hear from

4  you.

5          MR. GABBERT:  Okay.  Actually, I want --

6          MR. SPRAGENS:  He's trying to jump in the line of

7  fire. I appreciate that, Mr. Gabbert.

8          MR. GABBERT:  Based off what I've heard today, I want

9  to get some clarifications.

10          Is it the Trustee's position that if Brian Manookian

11  did not specifically file something in the court, withdrawn on

12  the record after he lost his license, as a sole member of both

13  of these entities, Cummings Manookian and Manookian, and could

14  not practice anymore, if he did not specifically file something

15  in court, when he really wasn't allowed to because he'd lost

16  his license, is it the Trustee's position that since he didn't

17  withdraw, even though he had no license, he's still entitled to

18  all the fees?

19          MR. YOUNG:  Your Honor, I mean, if we want to talk

20  about the substance of this, I'm happy to do that.

21          So here are the facts.  Mr. Manookian gets suspended.

22  The firm continues its existence.  Afsoon Hagh continues filing

23  pleadings on behalf of Cummings Manookian for months after the

24  suspension.  Cummings Manookian never files a notice of

25  withdrawal in the case.  Instead, what I assume, and in fact

Case 3:23-ap-90004 Doc 16-1 5 Filed 05/05/22 Entered 05/05/23 22:20:14 Desc
Exhibit Hearing Transcript    Page 64 of 96

1 there was a motion to withdraw filed by Mr. Manookian in the

2 case, no order was submitted.

3        The motion specifically -- I'm talking about the

4 Fitzgerald case right now.  The motion specifically says Afsoon

5 Hagh will continue representing the plaintiffs in this case.

6 She continued filing pleadings under the name of Cummings

7 Manookian for a number of months until such time as she finally

8 just dropped the moniker, Cummings Manookian, and kept

9 everything else the same.  Didn't file a new -- a substitution

10 of counsel or a notice of new address or anything, and we're

11 supposed to say that that somehow was the transition to a new

12 code.  I think the Court can understand our reservations about

13 that.

14        So to answer the question.  Yes, a licensed attorney

15 continued filing pleadings on behalf of Cummings Manookian.  It

16 does not matter that it was not Mr. Manookian, it was a

17 licensed attorney filing on behalf of the law firm.

18        And Mr. Manookian didn't lose his license; he was

19 suspended.  He was still a licensed attorney.  He could still

20 run a PLLC, he was just suspended.

21        MR. GABBERT:  Okay.  I just wanted clarification on

22 where we were.

23        THE COURT:  All right.

24        Oh, Mr. Spragens.

25        MR. SPRAGENS:  We'll step away from the

1    interrogatories at this time and talk about the requests for
2    admission, if that's okay, Your Honor?
3              THE COURT:  Okay.
4              MR. SPRAGENS:  And then I'm sure you'll have
5    direction for us on the interrogatories.
6              The request for admission, you know, the rule states
7    that you have to respond.  If you don't have sufficient
8    information, you have to say you've made a diligent search.
9    It's pretty mechanical.  I agree that it's a bit of a
10   technicality, but it is what the rule says.  And it's important
11   to us that the Trustee in responding to requests for admission
12   follow the rule and certify that she made a diligent effort to
13   find all information that was available to her.
14             So it's a copy and paste that can be made to all of
15   their responses to the RFAs that we've propounded in this case.
16             And if she doesn't have the information, she's
17   entitled to say that.  That is part of the RFA response
18   process, but she needs to certify that she's made a diligent
19   effort to find those documents.
20             So that's it on the, RFAs, Your Honor.
21             THE COURT:  All right.  And I would assume you agree
22   that diligent effort is an ongoing effort based off the
23   Trustee's unique position in the continuing discovery, the lack
24   of depositions, that there will be other information that might
25   change a response?

66

1          MR. SPRAGENS:  I agree with this much, Your Honor,

2  which is that the parties have an obligation to supplement

3  their discovery responses throughout the process.

4          THE COURT:  Okay.

5          MR. SPRAGENS:  So if she -- if something changes her

6  response and she serves supplemental responses to the requests,

7  you know, so be it.

8          THE COURT:  All right.

9          Mr. Young, I mean, that's kind of how it works,

10  right?

11          MR. YOUNG:  Yeah.

12          THE COURT:  So you answer based off of what you know.

13          MR. YOUNG:  And we've done that, Your Honor.  If what

14  he's looking for is a sentence in every one of these that says

15  we certify that we made a diligent effort to find information,

16  I can supplement it and add that sentence to every response, if

17  that's what he's looking for.

18          But we've, I mean, where we didn't know, we said why

19  we didn't know.

20          THE COURT:  Okay.

21      MS. DOWNING:  If the Court would just have them add that

22  sentence, I think that'll dispose of that issue.

23          THE COURT:  All right.  The Court's more than

24  happy --

25          MR. YOUNG:  No objection.

1          THE COURT:  All right.

2          MR. SPRAGENS:  And, Your Honor, if I could just say

3  one more thing?  In general, you know, I'm sensitive to the

4  Court's perception.  I don't want to put words in your mouth

5  that I'm some lawyer from a different practice who's come in

6  here and dumbed up the works here, and I assure you that's not

7  been my intention.

8          THE COURT:  Mr. Spragens, if I at all alluded to

9  that, that's not the case.  I think you've represented your

10  client and yourself very well in front of this Court, and the

11  Court has no negative inference, connotation, belief, or

12  assumption.

13          MR. SPRAGENS:  Well, I appreciate that.

14          I just wanted to say, you know, I do think that there

15  is good faith.  You know, I don't -- I hope the Court won't

16  find that either side has been acting in bad faith.  I mean, I

17  guess I hope the Court might find that they're not responding,

18  but I'm not going to win that one anyway.

19          So, you know, in my view, we have been trying to

20  operate in good faith here.  I have been trying to make Mr.

21  Manookian available to talk to them.  And, you know, I think

22  that I've got a good basis for the request for more information

23  and response to our interrogatories.  But if the Court says we

24  need to move on with depositions, I'm eager to do that.  And

25  we've been seeking depositions on the plaintiff's side for some

1 time now.

2          So that's all I'll say.  I'm sure you can tell us

3 where to go from here.

4          THE COURT:  All right.

5          And let's just go ahead and talk about depositions

6 real quick.

7          So I keep reading about one-on-one meetings.  Is that

8 separate from a deposition, or is that in reference to part of

9 the deposition?

10          MR. SPRAGENS:  No, Your Honor, that was part of the

11 meet and confer process that we were offering.  So to obviate

12 the need for this extremely pleasant hearing today I thought

13 that we could have an informal conversation to get a little

14 clarity about what each side was shooting at here, but then

15 there will be depositions obviously.  And we've been seeking a

16 deposition of the Trustee, and now Mr. Young has been

17 identified as a witness in their discovery responses, and so

18 we're going to seek to take a short deposition of him to find

19 out what he knows.  So that's where we are.

20          And in my view, you know, the Trustee should go

21 first.  She's the person who made the allegations and she has

22 the burden, and that's the practice that I'm familiar with, is

23 that the plaintiff goes first in these things.

24          THE COURT:  Okay.  Mr. Young?

25          MR. YOUNG:  Your Honor, we don't care if the Trustee

1  goes first, as long as everybody understands the Trustee, as

2  evidence by these discovery responses here, the Trustee knows

3  very little right now.  And that's going to be the Trustee's

4  response at this point, is she knows the information that she's

5  gotten from other parties, which, frankly, isn't a lot.

6          We have no objection if they want to take her

7  deposition first, that's fine.  But what we don't want to do is

8  have an eight-hour deposition, as they've suggested, only for

9  them to find out that she didn't really know that much.

10  And then say, after we've taken all these other depositions,

11  come back and say, now we want to depose the Trustee again.

12          But I'm open.  It doesn't matter to us.

13          I will say this.  I do want talk about scope,

14  specifically with regard to my deposition, because we did

15  identify the question was, anybody who had knowledge of

16  anything in the complaint.  I have not -- I was the receiver in

17  the case and I have knowledge of the references to what

18  happened in the receivership.  Frankly, all that's moot now,

19  because really all that had to do with was the movement of the

20  $750,000.  But if they want to take my deposition with regard

21  to anything prior to this bankruptcy, that's fine.

22          I want to make sure that we're all on the same page

23  that they're not going to ask me questions about what's

24  happened since the bankruptcy, since I've been operating as

25  counsel to the Trustee.  But I'm fine to tell them whatever I

70

1   know is, or knew, as the receiver.  That's fine.

2           But, you know, we're fine.  We would like a couple of

3   weeks to be able to look through anything that is going to come

4   in over the next couple of weeks.  The Trustee would like a

5   couple of weeks to look through all that before she gives a

6   deposition so that she can at least be as knowledgeable as

7   possible.  But beyond that, it's fine.

8           THE COURT:  All right.

9           MR. SPRAGENS:  I think we're mostly on the same page

10  there, Your Honor.  With respect to the -- I would not agree to

11  a specific time limitation on Mr. Young, on the questions to

12  Mr. Young, but I'm sensitive to the fact that if he has

13  confidential communications with his client we're not going to

14  be asking about those, or at least expecting any answers to

15  those.

16          If he has -- if there are things that he's done as

17  counsel to the Trustee involving third parties that are somehow

18  relevant to the claims, or the resolution of the claims, we may

19  want to get into that as well in the deposition.  But, you

20  know, this may be something that is not a live issue and we can

21  just think about it and come back if we foresee an issue.

22          THE COURT:  All right.  So between now and two

23  o'clock, by the end of this day, I want the parties to have

24  conferred and reached a schedule for depositions, and within

25  the order, a detailed scope of those depositions and any

Case 3:20-cv-90024   Doc 161-1   Filed 05/05/22   Entered 05/05/22 22:20:14   Desc
Exhibit Hearing Transcript   Page 71 of 96

1  specifics that are necessary to be fully disclosed within the

2  order.

3          And also, to address the request for admissions

4  issue.  It's fairly early in the process for admissions, given

5  all that needs to happen.  So please address that with some

6  formality once the formal discovery to include the depositions

7  are done, when the amendments for the admissions should be

8  propounded on the other side.

9          MR. YOUNG:  And, Your Honor, just as a formal matter

10  on our motions to compel further interrogatory responses.  What

11  I think I heard the Court saying was, after the depositions we

12  could expect to get more information from the Trustee.  But I

13  just want to know what the ruling is on our motion, I guess.

14          THE COURT:  So same with date certain.  After

15  conclusion of all depositions, that there would be amendments

16  provided and certification that each answer is still valid so

17  that there's no confusion of what the Trustee's position is.

18          And then, of course, you're postured to take whatever

19  next step you feel your client can take, whether it's an

20  outright motion to dismiss for failure to state a cause, or,

21  you know, one or -- one count or another that no longer is

22  sustainable, whatever you feel.  That's the appropriate time to

23  tee it up for further action from the Court.

24          MR. SPRAGENS:  Your Honor, may I address one other

25  thing?  I mentioned this, that since our last hearing we

1  received another 86 request for admission from Manookian, PLLC.

2  Could we include in that order -- because we could go through

3  this whole thing again and the Trustee is still saying, we

4  don't know, we don't know, we don't know, or we could simply

5  say that those responses will be due at the conclusion of

6  discovery and save everybody a lot of time and trouble on that

7  second set of requests for admission.

8          THE COURT:  Yeah.  And well, the Court has a

9  threshold question of, why were the requests propounded late,

10  or after the deadline in the original order?

11          MR. SPRAGENS:  I confess, Your Honor, that I did not

12  understand the order to apply to RFAs, which I think of as a

13  tool to sharpen the issues as the case proceeds.  So I

14  apologize if we violated the Court's order on written

15  discovery, that was not my intent.

16          In general, my view is that the RFAs help sharpen the

17  case.  And we can understand if the Trustee agrees that, okay,

18  this is the actual agreement.  And, you know, we're not going

19  to have debates about the authenticity of evidence and stuff

20  like that.  So that's the thought process behind them.

21          And I personally would prefer to have the responses

22  before the deposition so at least we can cross some things off

23  the list before we ask questions.  But, you know, the Court

24  will do what it will do.

25          MR. YOUNG:  And we're not going to know the answers

1 to all the authenticity questions until after depositions, Your

2 Honor.

3          THE COURT:  All right.  Let's keep them after

4 depositions, on the same time frame as all the other written

5 discovery that's going to be amended or supplemented.

6          And I think the parties should both bear in mind that

7 there's a dispositive motion deadline of June 24th.  So keep

8 that in mind when you propose something to the Court this

9 afternoon on the timing so that you don't back yourself into a

10 corner on the deadlines that are yet to come.

11          All right.  And although a little bit early, this is

12 probably a good time to take a break.  You've got your homework

13 for the next couple hours.  And I'll just say, the Court

14 understands that the parties are representing their clients,

15 and trying to zealously represent their clients, and as we've

16 seen today, I mean, I haven't seen either party be

17 unreasonable.  I have seen some discussions that had to happen

18 in order to get to the actual issues, but the Court believes

19 the parties are trying to be reasonable.

20          What the Court doesn't believe is happening is that

21 there's adequate communication going on.  So this is your

22 opportunity to communicate and effectively work through some of

23 these barriers so that we can press forward and resolve this

24 case, finally, so that you don't have to keep coming over here.

25          And the tip off is at 11:15, by the way.

1          So, you know, the Court wants to make sure that the

2     parties understand the Court's here to help you if needed.  But

3     there's enough smart lawyers in this room that self-help is the

4     best help, and, you know, let's try to resolve these things,

5     communicate, figure out where the issues are.

6          Understand that bankruptcy proceedings are a little

7     less certain at the beginning because the Trustee doesn't have

8     a lot of information.  But the reality is, at the end of the

9     day, it's a federal court proceeding subject to the same rules

10    and the same law as any other adversary proceeding.

11          So keep that in mind, that we're trying to minimize

12    the cost to the estate.  Because, ultimately, that costs

13    somebody else money.  The unsecured creditors are paying for

14    it, or, you know, if this is an excess case, Mr. Manookian was

15    paying for it.  I mean, somebody is paying for having three

16    lawyers and a Trustee sitting in a room.

17          It sounds like the beginning of a bad joke, but, you

18    know, that's where we are.

19          So please take the next couple hours.  I'll be back

20    on the bench at two o'clock.  If there's any other discovery

21    issues that haven't been addressed that we need to address --

22    is there anything else out there besides what we've already

23    talked about?

24          MR. SPRAGENS:  Not from my perspective, Your Honor.

25          MR. YOUNG:  I don't think so, Your Honor.

 1              MR. GABBERT:  Your Honor, please, if I may?  I think

 2    the only thing I'm looking for is any other Fitzgerald

 3    agreement.  Other than, I don't have anything else on this

 4    sheet, do I?

 5              MR. SPRAGENS:  I think that's right.

 6              MR. GABBERT:  So if I could just provided him a

 7    statement regarding that, do I have to come back?  Because I'm

 8    not involved in all this other stuff.

 9              MS. YOUNG:  He's trying to save -- trying to save

10    money.

11              MR. SPRAGENS:  Your Honor, I --

12              THE COURT:  Mr. Gabbert, the Court's -- if all issues

13    are resolved, the Court's happy to send you on your way.

14              MR. GABBERT:  Well, he can -- he can advise that I

15    have responded by what the rules are.

16              MR. SPRAGENS:  I'll make that representation for

17    Mr. Gabbert.

18              THE COURT:  All right.  Good enough.

19              All right.  Court will be adjourned until -- or in

20    recess till two o'clock this afternoon.

21              THE CLERK:  All rise.

22         (Recess taken at 10:28 a.m.)

23         (Proceedings resumed at 2:08 p.m.)

24              THE CLERK:  All rise.

25              THE COURT:  Please take your seats.

1          All right.  Mr. Young?

2          MR. YOUNG:  Your Honor, Phillip Young on behalf of

3    the Trustee.

4          I think we've made some progress on most things.  I

5    think there are still a few things that we'd like the Court's

6    input on.  Let me start with the things that I think that we've

7    agreed upon.  This is really just for the record.  This will

8    kind of be incorporated into the order we'll submit.

9          But Mr. Gabbert is going to confirm, by March 25th,

10   that's the only Fitzgerald letter.  We had referenced that.

11         THE COURT:  Okay.

12         MR. YOUNG:  I think he was unable to get in touch

13   with his client this afternoon.  So he's just agreed that by

14   March 25th, he'll do that.

15         We're also going to provide that Manookian, PLLC will

16   amend its response to Interrogatory Number 5, as the Court

17   instructed by March 25th, by that same date.

18         And then, as the Court suggested, we've given more

19   specific information on the Request for Production Number 1,

20   that's the one about defenses.  We provided more specific, kind

21   of bullet point things, that we're looking for to Manookian,

22   PLLC.  And so they're going to respond accordingly.

23         We've agreed that we're going to amend our response

24   to Interrogatory Number 1 by March 25th.  That's the one that

25   asks for what individuals have knowledge.

1          And the reason being, so the Court understands why

2     that is.  You know, the scope of the complaint when filed was

3     16 cases, there were 16.  Now we're talking about two case.  So

4     obviously that really funnels down what actually is in dispute.

5     And so that the parties don't waste time worrying about, you

6     know, depositions on parties that really don't matter anymore,

7     we're going to amend that to make that clear.

8          We already mentioned this, that I was going to add

9     the certification language to the request for admissions that

10    Mr. Spragens had requested.

11         We've agreed that by June 1 all parties will amend

12    interrogatory responses, requests for admission responses, that

13    we'll respond to those second -- that second set of requests

14    for admission by June 1.

15         We've also agreed that topics for depositions will be

16    identified in the deposition notices so that all the parties

17    will have notice of that.

18         And then we've agreed on a deposition schedule for, I

19    guess, the four primary depositions.  And that is Jeanne

20    Burton, me as receiver, Brian Manookian, and Afsoon Hagh.  And

21    those dates are, Jeanne Burton's will be April 20th at 10 a.m.,

22    mine will be April 21st at 10 a.m., Mr. Manookian, who the

23    notice will be for Manookian, PLLC, Cummings Manookian, and

24    Brian Manookian, we'll notice them all up on the same day, May

25    9th at 10.  And then Afsoon Hagh and Hagh Law at May 10th at

1  ten o'clock.

2          And so we'll put all that in the order.

3          MR. SPRAGENS:  Mr. Young, can I just add?

4          MR. YOUNG:  Yeah.  Go ahead.

5          MR. SPRAGENS:  Mr. Gabbert, I don't think, has agreed

6  on the deposition schedule.  And so when I spoke to him he had

7  a preference for having the Trustee at the end, which I

8  understand is a more conventional practice in bankruptcy court.

9  My client has a preference for having the Trustee at the

10  beginning.  And so as I said in the email to you, that's an

11  issue that is still sticky.  But we agree with the scheduling

12  that you just announced.

13          MR. YOUNG:  And I do want to address that issue,

14  because we want to avoid these repeat depositions.  We don't

15  want to have to go through a deposition where the Trustee says,

16  you know, I don't know that yet, I don't know that yet, I don't

17  know that yet, and then go through another deposition at the

18  end to ask essentially the same questions.

19          We don't care if the parties want to take Ms.

20  Burton's deposition early, that's fine.  What we don't want to

21  do is to have repeat depositions.  To have, you know, one April

22  20th and one May 30th.  And so we had a disagreement about

23  that.

24          And as Mr Spragens said, Mr. Gabbert, I think, has a

25  preference toward taking it towards the end, and Mr. Spragens

79

1   has a preference toward taking it toward the beginning.  But we

2   only want the Trustee to sit for one, eight-hour deposition.

3   We don't want to have to, you know, spread this out.  And so

4   that was --

5           THE COURT:  Well --

6           MR. YOUNG:  -- one of the issues that we were going

7   to see --

8           THE COURT:  I'll make a statement that if there is a

9   second deposition, the party requesting it may end up paying

10   for it.  I'll leave it at that.  If Mr. Manookian drives this

11   such that what is probably the course of action that makes the

12   least amount of sense in this scenario, then if there is a

13   second deposition, he may be paying for that time to take that

14   deposition.  But I'll let the parties -- if the parties are

15   agreeable to that schedule, we'll go forward with that

16   schedule.

17           MR. SPRAGENS:  Right.

18           THE COURT:  But know that the nature of this

19   proceeding, it doesn't make a bit of sense to do the Trustee

20   first.

21           MR. YOUNG:  I hear you loud and clear, Your Honor.

22           THE COURT:  So --

23           MR. YOUNG:  Yeah.  The one thing I was going to say

24   is, I was always trying to split the hairs between the two

25   parties on our side of the table here.  I thought about if we

1 tried to take her deposition and reserved some of the time for

2 later -- I mean, one of the issues here is because the Court is

3 not going to require anybody to supplement their

4 interrogatories until after through depositions have been

5 taken, there is room for some serious changes in the written

6 discovery at that time, and that's what we want to sort of

7 guard against is that all of a sudden there's a new theory that

8 we couldn't anticipate, or new information that we couldn't

9 anticipate, that comes out.

10     I take your point though, that if a second deposition

11 is needed, and if the Court finds that it's not warranted or

12 whatever, Mr. Manookian would be paying for it.

13     THE COURT:  Yeah.  And again, it's bankruptcy, right?

14 We got limited number of theories that are going to be out

15 there.  Let's be real.  These are attorneys, everybody knows

16 what the theories are probably going to be, and the information

17 that's going to come out is going to drive that one way or the

18 other.  So let's not make it harder than it really is.  This is

19 not a new or novel concept.  These are not issues that are

20 first impression.

21     This is what happens here in bankruptcy court every

22 day.  You have a company that is no longer operating, there are

23 books and records, there's still effectively accounts

24 receivable out there that need to be collected, and the Trustee

25 is trying to collect those accounts receivable and look back as

1  to whether there's any transfers or transactions that can be

2  set aside.  I mean, it's not that hard, so --

3         MR. YOUNG:  And the Trustee does view this, for the

4  record, as an accounts receivable case.  That's what we view

5  this as, is as an accounts receivable case, primarily.  And

6  that's the way we've been proceeding, but --

7         THE COURT:  Yeah.

8         And I get it, Mr. Spragens, that -- and again, you

9  know, you're representing your client zealously, and the

10 Court's making no determination one way or the other.  You

11 know, your strategy and your client's strategy is what it is.

12 But know that, you know, this Court's seen these cases a

13 thousand times and is not going to be surprised or hoodwinked

14 by anything and is well capable of dealing with any "gotcha"

15 moments as they come, and will deal with them fairly harshly on

16 whichever side they come out, just given the fact that we're

17 wasting a day here to go over discovery requests.

18        So I'm taking copious notes on what's said here.  I'm

19 going to listen to this transcript again.  And if we get to a

20 trial situation where there's something that needs to be

21 addressed, it will not end well for whichever side is the cause

22 of it, period.

23        MR. SPRAGENS:  Thank you, Your Honor.

24        MR. YOUNG:  Your Honor, one other -- one other thing

25 about which we've been unable to reach an agreement is the

1   location of the depositions.  The Trustee suggested that these

2   four in-person depositions take place here in the Court, in the

3   courthouse.  There's lots of reasons for that.  It's a

4   centralized location, it has security, the Court's more

5   available if there becomes a problem.  We hope there's not a

6   problem, but --

7             THE COURT:  We're having the depositions here.

8             MR. SPRAGENS:  That's fine, Your Honor.  And just for

9   the record, I'll preserve my objection to that.  And I heard

10  Mr. Gabbert object to it earlier, as well.

11            THE COURT:  Okay.  Well, if the parties can't agree,

12  you know, you still have the opportunity to agree on a

13  location.

14            MR. SPRAGENS:  Sure.

15            THE COURT:  But in the absence of agreement, we'll

16  hold a hearing.  I'll be in my chambers or available by video.

17  If the there's a problem, we'll address it on the spot.  So,

18  you know, I don't know of any other way to do this, if we can't

19  agree on something as simple as location.

20            MR. SPRAGENS:  Well, I thought the normal rule was

21  you produce the witness at the witness's place of business or

22  convenience, basically.  So I was surprised to hear this

23  proposal, that all the depositions would be conducted here.

24            This parking lot out back is $40 a day I noted, as I

25  tried to dodge parking tickets today.  And so I was thinking

1  there might be a more convenient reason.  I don't buy that

2  there's a security issue in this case.  The Court is available,

3  I appreciate that, by telephone, video, or all the other ways

4  that we can get access to the Court.  So to me, it's overkill

5  to have them at the courthouse.

6            THE COURT:  I agree.

7            MR. SPRAGENS:  And I -- so this wasn't our proposal,

8  and I think it's a departure from the ordinary course and I

9  don't understand the basis for it.

10           THE COURT:  Okay.

11           MR. SPRAGENS:  So I --

12           THE COURT:  So, Mr. Young, let's articulate a basis

13  on the record.

14           MR. YOUNG:  Sure.  First of all, I think the Court

15  knows that this is not -- it's not unusual for a Trustee to

16  conduct depositions at the courthouse.  That's fairly common

17  for trustee's to do.

18           Secondly, you know, it's more centralized than having

19  parties come to my office in Williamson County, for example.

20  This is a lot more central location.

21           And third, we do think that there's a security issue

22  here.  There's already been a restraining order put down

23  against Mr. Manookian by one of the creditor's lawyers in this

24  case, and I don't take that lightly on behalf of my client.

25           So those are the reasons.

1        MR. SPRAGENS: Well, and, you know, my office is just

2 down the street and parking is free.

3        There's no security issue. I don't think that

4 there's any record that would support that there is a security

5 issue in this ordinary bankruptcy case involving professional

6 lawyers on all sides.

7        So this proposal was presented to me. I said I

8 disagreed with it. And Mr. Young said, well, we'll take it up

9 with the Court. So, you know, in my view, this is the

10 departure from the norm, not the other way around.

11        THE COURT: Okay.

12        And, Mr. Young, you're going to represent that you're

13 uncomfortable doing depositions in Mr. Spragens' office?

14        MR. YOUNG: Yes, Your Honor.

15        THE COURT: All right. And then I'll just address

16 the 100 pound gorilla in the room on that issue.

17        To be candid, Mr. Spragens, I mean, your client's

18 past behavior before the tribunals, and I've had at least two

19 lawyers call the Court and say they don't feel comfortable if

20 your client is going to appear, and, you know, the Court takes

21 those concerns very seriously and makes no conclusion on

22 whether they are valid, they are perceptions which drive

23 behaviors of other parties. And to eliminate any of those

24 perceptions, and to protect everyone against any allegations of

25 bad behavior, misbehavior, or perceived misbehavior, it makes

1  sense to do them here in an environment where no one can get

2  your client further down a rabbit hole of he did this or he did

3  that, that we're in a neutral environment, which affords

4  certain protections. And if nothing else, in terms of

5  everybody's on their best behavior.

6          And so the Court's going to make that determination,

7  that the depositions, unless the parties can agree, will be

8  held here in the courthouse. And as a matter of fact, again,

9  there will be some method available to reach the Court if

10 during those depositions we have further in issues with

11 discovery.

12         MR. YOUNG: Thank you, Your Honor.

13         I think the last issue that we needed, unless Mr.

14 Spragens has something else that I've forgotten. The last

15 issue that I have on my list that we needed some input from the

16 Court on is the scope of my deposition.

17         There was a question that was asked in the

18 interrogatories about, list all parties who had knowledge of

19 any element of the complaint, you know, any of the complaint.

20 The complaint originally, if the Court will recall, had a fair,

21 a substantial amount about the $715,000 and about the transfer

22 of that and about the genesis of that in the receivership.

23         Obviously, as the former receiver in that case I had

24 knowledge about that. That part's not so relevant anymore

25 because the money's frozen and now we're really talking about

86

1   two cases.  Nevertheless, I'm happy to sit for a deposition.

2   However, I do think that the Court needs to define the scope of

3   that.

4          I would suggest that the scope of that has to do only

5   with the allegations that are in the complaint and only with

6   regard to things up to the petition date.

7          I will represent to the Court that after the petition

8   date my role in this case has been as special counsel to the

9   Trustee.  Mr. Sprague has specifically mentioned, and this is

10  something that came up before, and I'm happy to address it

11  straight on if the Court wants to talk about it today, but this

12  allegation of some sort of a kickback that the Trustee allowed

13  or reduced, allowed a reduced claim to the Chase parties

14  because the Chase parties entered into an order that provided

15  that any remaining receivership, outstanding receivership fees,

16  be paid by the Chase party.

17         First of all, I wasn't involved in that order.

18         Second of all, it's not been paid, so this is a

19  complete non-issue.  Nonetheless, it keeps coming up, but it's

20  not related to this adversary proceeding.  That's related to,

21  if at all, it's related to the claims allowance and

22  disallowance.  That's not related to this adversary proceeding

23  at all.

24         And so I would just like the Court's guidance on what

25  the allowable scope is of a deposition, you know, of me

1  specifically, because that seems to be where some tension is

2           THE COURT:  All right.  Mr. Spragens?

3           MR. SPRAGENS:  In my experience, at least, it is

4  unorthodox, to say the least, to have a case in which an

5  attorney is negotiating the scope of his own deposition as a

6  fact witness in the case.  So we are in a weird posture here.

7  And I think that does speak to the potential for, you know,

8  what we will want to ask Mr. Young about.

9           He represented to me in the conference room that it's

10 really just about the $750,000 or whatever, that 715,000,

11 excuse me, in the receivership.  You know, I want to know what

12 he knows about what's in the complaint.  He's disclosed himself

13 effectively as a fact witness here.  I want to know how he's

14 being compensated for things, because I think that goes to his

15 bias.

16          And I think that is a permissible area of inquiry is,

17 do you stand to gain if you testify a certain way in this case

18 or not?  And I think that's reasonable, both about the knowing

19 about the Chase case and about his role here.

20          I don't need to go into any confidential attorney-

21 client communications, and I don't intend to.  But I do think

22 that, you know, we started this case, frankly, before I was

23 involved, talking about a potential need for disqualification

24 of Mr. Young.  And I do think that the fact that he's now

25 disclosed himself as a witness, which surprised us, opens him

1  up to inquiry on that.  And so certainly whatever he tells us

2  he knows about that's in the case right now is going to be the

3  bulk of what we talk about.

4         But I do want to probe for bias.  I want to probe for

5  any sort of improper motive.  It's awkward to do to a fellow

6  member of the bar.  You know, we were just talking about our

7  vacations and our hiking interests and all that stuff.  But I

8  think that's part of the job, and if he's going to be a witness

9  and the lawyer here, I should be allowed to ask some of those

10 questions.

11        So I would urge the Court not to set a strict date

12 cutoff, but, you know, admonish us to only stay within the

13 boundaries of what's acceptable as we try to prepare an

14 adversary trial in this court.

15        THE COURT:  All right.

16        And, Mr. Young, I think it is reasonable to probe

17 into any of those issues that Mr. Spragens has articulated.

18 So I will not bound the deposition to such limited scope that

19 he can't inquire about your motive, motivation, or compensation

20 in any way.

21        Again I will caution that it better be relevant and

22 stay relevant.  And as you've articulated today, that's within

23 the fair bounds of what we do as lawyers is answer questions

24 about why we're here, if we're ever in the position of being a

25 witness, and it goes to credibility, it goes to motivation.

1 And so that's perfectly permissible.

2       But what I do not want is an attempt to deviate in a

3 way that's not going to be productive for anyone and just waste

4 everybody's time. Because, again, if we're going to waste

5 people's time, that person wasting time will pay for that time.

6 And I can't express how serious I am about charging back to the

7 party who is causing the unnecessary delay or being

8 unreasonable.

9       Again, these are attorneys talking about attorneys

10 and law firms. And even Mr. Young, if he is a witness, he's

11 another attorney. So everyone involved in this case is a

12 member of the bar in some form or fashion, and I expect a

13 little bit of common sense and not to take the Court for not

14 understanding what's going on if it deviates from that. And so

15 just keep that in mind, all the parties that --

16       Again, this is not rocket science. This is the

17 couple of thousand adversaries since I've been on the bench,

18 and there's nothing in this case that I haven't seen before

19 that surprises me or that I need to look up in WestLaw or

20 Google to figure out how this is going to go. These are all

21 issues that are fairly routine.

22       I've got a Trustee over here who's been on the panel

23 for more than 20 years and has handled thousands of cases and

24 brought this adversary proceeding in the course of

25 administering it as an estate, that's not unique or novel.

ACCESS TRANSCRIPTS, LLC      1-855-USE-ACCESS (873-2223)

Case 3:22-ap-90002-4   Doc 161-1 5 Filed 05/05/22 Entered 05/05/22 42:20:14 # 165 Desc
Exhibit Hearing Transcript    Page 90 of 96

1        So I understand we are all representing clients

2   zealously, but by the same token, you're wasting your time on

3   this forum that's going to be before a judge, not a jury,

4   that's seen this a thousand times before, where we routinely

5   stipulate to all the relevant facts, we proffer evidence more

6   likely than we present witnesses.

7   .        This Court is able to resolve these issues

8   expeditiously if given the opportunity.  And so let's drive

9   towards that opportunity for the Court to do what this Court

10  does in fairly efficient fashion.

11       MR. SPRAGENS:  We're eager to get to that point.  And

12  there aren't side shows on our side.  We intend to get to the

13  point where we can get an adjudication in this.

14       THE COURT:  Okay.

15       MR. SPRAGENS:  So I hear you.

16       MR. YOUNG:  Your Honor, with that, I believe those

17  are the only issues that we had open as far as the -- I think

18  every thing else was agreed upon.  And we understood the

19  Court's direction on everything else, as far as putting

20  together an order.

21       THE COURT:  All right.

22       MR. YOUNG:  And I'm going to circulate it to Mr.

23  Spragens before we submit it to the Court to make sure that --

24       THE COURT:  All right.

25       MR. YOUNG:  -- that everything is accurate.

1          THE COURT:  And the only thing, I've got a couple

2    things.  On the depositions the order should detail the scope,

3    because I don't want any surprises from any party who later

4    says, well, I didn't know that's what was going to be asked.

5    So within this order there needs to be some detail as to the

6    scope of the depositions.

7          MR. SPRAGENS:  We can do that, Your Honor.

8          THE COURT:  All right.

9          And as far as length of depositions, is it correct

10   that you're anticipating an eight-hour deposition for the

11   Trustee?

12         MR. SPRAGENS:  No Your Honor.  I mean, I think that

13   the rules only allow seven hours, and I hope not to even need

14   all seven hours.  I never want to take a seven-hour deposition.

15         THE COURT:  Okay.

16         MR. SPRAGENS:  But I do think that the rules allow it

17   if we need it, and hopefully we won't.

18         THE COURT:  All right.

19         And obviously with the contentious nature, make sure

20   that that order specifically details the time in which the

21   Trustee and all the other witnesses will be available for their

22   deposition.  And if it's the full seven hours for each witness,

23   so be it.  But I don't want any other issues related to

24   discovery, so let's make sure that that order adequately

25   details everything.

Case 3:22-ap-90004   Doc 161-15  Filed 05/05/22 Entered 05/05/23 22:30:19  Desc
Case 3:22-ap-90004   Doc 64-1  Filed 05/24/22  Page 105 of 122  Page ID #:157
Exhibit Hearing Transcript    Page 92 of 96

1          And I'd like it to be an agreed order.  So rather

2    than just circulate it to Mr. Spragens, I want he and Mr.

3    Gabbert to sign off on the order in its entirety.

4          MR. SPRAGENS:  Yes, Your Honor.

5          MR. YOUNG:  And, Your Honor, as I look at the biggest

6    area of, sort of outstanding question marks about the order,

7    it's what to do about this deposition.  I mean, we have

8    different positions on my side here about when the Trustee's

9    deposition should be taken.  So I'm looking for little

10   guidance, probably, on what we should put in the order that

11   says if there is a second deposition it will come at the

12   requester's expense, unless good cause is shown, or something

13   like that.

14         Is that an appropriate way to phrase that?  I suppose

15   that's what I'm asking.

16         THE COURT:  Yeah. I'll leave it to you all to come up

17   with the exact language.  But the intent is that the parties

18   are agreeing to this.  We need to be efficient and effective.

19   I'm not going to get into the weeds on who goes first, because

20   if I have to do that, then I might as well be trying and

21   representing your clients for you.

22         But I am going to say that common sense needs to

23   prevail here.  That, again, this isn't an IP case.

24         MR. SPRAGENS:  Thank God.

25         THE COURT:  I echo that sentiment.

1        You know, the Trustee needs -- you know, the goal

2   should be to maximize the Trustee's ability to answer the

3   questions.  And if taking the Trustee's deposition first is

4   going to be a waste of time, which I would bet my money to a

5   large extent it will be, then why are we doing it that way?

6        And if you choose to go down that road, the party who

7   made that choice is going to pay for that time for the

8   attorney, or attorneys, that have to sit there for seven, eight

9   hours, or however long it is, for the Trustee to then be in a

10  position to answer those questions.

11       So craft the language so that it's clear that -- I'm

12  going to leave it to the parties to cause a train wreck if you

13  want to.  But, you know, the party that led that train off the

14  tracks is going to be the one that's going to compensate the

15  other side for the time that it takes to actually do it right.

16       You know, and unfortunately, the Trustee gets

17  compensated based off of a formula and not actual time.  But,

18  you know, again, I'm not interested in wasting the Trustee's

19  time twice, as well, on when they, you know, she could move on

20  to other cases that are probably equally as frustrating and

21  difficult to get resolution to.

22       So those are the reasons why if you go down the wrong

23  road you're going to, you know, whichever party drives it is

24  going to be the one that compensates everyone in the room for

25  their time.

1　　　　　　　MR. SPRAGENS:  Thank you, Your Honor.

2　　　　　　　THE COURT:  Okay.

3　　　　　　　MR. YOUNG:  Your Honor, I don't think we had any

4　other questions or comments about the order, unless the Court

5　has some other question for the Trustee.

6　　　　　　　THE COURT:  No other questions.  But again, make sure

7　it needs to be an agreed order, that it fully addresses

8　everything we've talked about today.

9　　　　　　　If there's any questions related to the dates that

10　are already in the scheduling order, such as the dispositive

11　motions or trial dates, we have not changed those.  And I need

12　to know now if the parties believe they're going to be unable

13　to comply with those dates.  So within that order each party

14　needs to certify that the remaining dates are still good to go.

15　　　　　　　MR. SPRAGENS:  Yes, Your Honor.

16　　　　　　　THE COURT:  All right.  And I think -- I think that's

17　all I have.

18　　　　　　　Anything else?

19　　　　　　　MR. YOUNG:  Nothing from the Trustee, Your Honor.

20　　　　　　　MR. SPRAGENS:  No, Your Honor.

21　　　　　　　THE COURT:  All right.  Again, thank you for your

22　time and attention.  And hopefully we'll get through this one

23　in a more expeditious fashion going forward.

24　　　　　　　But if there are issues, the Court is obviously

25　available to address those issues.  But I still hold out

95

1  confidence that with the good lawyers involved in this case

2  they'll be able to communicate a little bit better so that we

3  cannot be here on St. Patrick's Day in 2023, perhaps.

4           So with that said, the Court will be adjourned.

5           THE CLERK:  All rise.

6       (Proceedings concluded at 2:35 p.m.)

7                          * * * * *

8

9

10

11

12

13

14              **C E R T I F I C A T I O N**

15

16           I, Alicia Jarrett, court-approved transcriber, hereby

17  certify that the foregoing is a correct transcript from the

18  official electronic sound recording of the proceedings in the

19  above-entitled matter.

20

21

22

23  _____

24  ALICIA JARRETT, AAERT NO. 428     DATE: March 23, 2022

25  ACCESS TRANSCRIPTS, LLC

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **IN RE:** | **Case No, 3:19-bk-07235**<br>**Chapter 7**<br>**Judge Walker** |
| **CUMMINGS MANOOKIAN, PLLC** | |
| **Debtor.** | **Adv. Proc. No. 3:20-ap-90002** |
| **JEANNE ANN BURTON, TRUSTEE** | |
| **Plaintiff,** | |
| **v.** | |
| **HAGH LAW, PLLC; AFSOON HAGH; and MANOOKIAN PLLC,** | |
| **Defendants.** | |

## BRIAN MANOOKIAN AND MANOOKIAN PLLC'S MOTION TO DISQUALIFY BANKRUPTCY JUDGE CHARLES WALKER

Brian Manookian and Manookian PLLC ("the Manookian Parties") respectfully ask the Court to recuse itself from further consideration of this matter, pursuant to 28 U.S.C. §§ 455(a), (b)(1), and the Code of Conduct for Federal Judges.

The Court is required to disqualify itself from this matter because it engaged in multiple prohibited *ex parte* communications about Brian Manookian[1] and this proceeding with "at least two [unidentified] lawyers" while this action has been pending.[2]

---

[1] Brian Manookian is the sole member of the Debtor, Cummings Manookian, and the Sole Member of the Defendant, Manookian PLLC.

[2] Ex. 1, Transcript of Pretrial Conference and Motion Hearing, March 17, 2022, at 84:15-85:11. On April 21, 2022, the Manookian Parties learned that the Trustee, through her

The Court then failed to promptly notify the parties of its repeated *ex parte* conversations as required by the Code of Conduct for United States Judges.[3]  Instead, the Court only disclosed their occurrence much later, and only then to justify the Court's order that depositions in this matter be conducted at a secure courthouse location.  In doing so, the Court attributed its order to unarticulated "concerns" about Brian Manookian which were communicated directly to the Court by undisclosed attorneys in various *ex parte* phone calls — buttressed by other information the Court gleaned from extrajudicial research — calls that neither the Court nor those attorneys disclosed to the Manookian Parties at the time.

As a result, the Manookian Parties were never able to respond to the *ex parte* representations, or even make a record regarding those improper communications and independent research for review by a superior court. To this day, potentially years after the *ex parte* communications in this still-pending case, the Manookian Parties thus remain in the dark as to the substance of those prohibited communications, although their corrosive effect on the Court has recently become clear.

The Court and the as-yet unidentified attorneys have, intentionally or not, engaged in conduct that violates multiple provisions of the Code of Conduct for United States Judges as well as the Rules of Professional Conduct governing attorneys licensed in Tennessee.[4]  Recusal is required by statute. *See* 28 U.S.C. § 455(a) & (b)(1).

---

Special Counsel, has had at least one improper *ex parte* communication with the Court about Mr. Manookian.  Ex. 2, Deposition of Phillip Young, at 43:15-45:25.

[3] Code of Conduct for United States Judges, Canon 3(A)(4).

[4] *Id. See also* Tennessee Supreme Court Rule 8, Rule of Professional Conduct 3.5, Impartiality and Decorum of the Tribunal ("A lawyer shall not: (a) seek to influence a judge, juror, prospective juror, or other official by means prohibited by law; [or] (b) communicate ex parte with such a person during the proceeding unless authorized to do so by law or court order.").

This is not a close call.  The Court is required to immediately disqualify itself from this case.  The Court should additionally submit a sworn declaration detailing the dates, substance of, and parties to each of its *ex parte* communications so that the Manookian Parties may: (1) determine which orders of this Court occurred after the improper communications; (2) ascertain whether the Court is now a witness to party or creditor statements such that depositions of the *ex parte* participants is necessary; and (3) report any improper conduct to the appropriate licensing and oversight authorities.

## I.  LEGAL STANDARD

Canon Three of the Code of Conduct for Federal Judges provides that the Court shall not permit *ex parte* communications, except in limited circumstances, and if such a communication is received, the Court must give all parties prompt notice of the communication and an opportunity to respond:

> Except as set out below, a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers. If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested. A judge may:
>
> (a) initiate, permit, or consider ex parte communications as authorized by law;
>
> (b) when circumstances require it, permit ex parte communication for scheduling, administrative, or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication;
>
> (c) obtain the written advice of a disinterested expert on the law, but only after giving advance notice to the parties of the

person to be consulted and the subject matter of the advice and affording the parties reasonable opportunity to object and respond to the notice and to the advice received; or

(d) with the consent of the parties, confer separately with the parties and their counsel in an effort to mediate or settle pending matters.

(emphasis added).

The Tennessee Rules of Professional Conduct are likewise clear that attorneys may not engage in *ex parte* communications with the Court. Rule 3.5 states that, "A lawyer shall not seek to influence a judge, juror, prospective juror, or other official by means prohibited by law; [or] communicate ex parte with such a person during the proceeding unless authorized to do so by law or court order."

Finally, federal law mandates that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This includes but is not limited to situations "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." *Id.* § 455(b)(1). Receiving, failing to disclose, and then ruling based upon improper *ex parte* communications and extrajudicial information in violation of the Federal Code of Conduct for Judges is, definitionally, conduct resulting in a judge's impartiality reasonably being questioned.

## II. FACTUAL BACKGROUND

On March 17, 2022, counsel to the Trustee, Phillip Young, announced in a hearing that he sought to conduct depositions in this case exclusively at a "secured" location at the courthouse, because of a heretofore unrevealed "security issue" about Brian Manookian,

the sole member of the Debtor Cummings Manookian and the Adversary Defendant, Manookian PLLC.[5]  Counsel for Mr. Manookian and Manookian PLLC, John Spragens, immediately opposed the request, as did counsel for Adversary Defendants Afsoon Hagh and Hagh Law.[6]

Rather than permit briefing or argument on the issue, the Court gratuitously and *sua sponte* began holding forth on what it described as the "100 pound gorilla in the room on that issue," despite no such issue never having been previously addressed to the Court by any party (at least not properly or on the record).  First, the Court – after undersigned counsel said he would preserve his objection to this departure from the ordinary course of proceedings for appeal – undertook to create an evidentiary record in support of his ruling.[7]  Next, the Court solicited a representation from the Trustee's counsel to the effect that the Trustee's counsel was "uncomfortable doing depositions in [defense counsel's] office."  Finally, the Court described *ex parte* communications and offered its own view, based upon undisclosed information not in the record, purporting to justify that Mr. Manookian's unspecified "past behavior" in front of "the tribunals" posed an undefined security threat:

---

[5] Ex. 1, Transcript of Pretrial Conference, March 17, 2022, at 83:21-25.

[6] *Id.*, at Page 82:8-10.

[7] *Id.*, at Page 82:8-83:13 (The Court: "So, Mr. Young, let's articulate a basis on the record.").

```
11          THE COURT:  Okay.
12          And, Mr. Young, you're going to represent that you're
13 uncomfortable doing depositions in Mr. Spragens' office?
14          MR. YOUNG:  Yes, Your Honor.
15          THE COURT:  All right.  And then I'll just address
16 the 100 pound gorilla in the room on that issue.
17          To be candid, Mr. Spragens, I mean, your client's
18 past behavior before the tribunals, and I've had at least two
19 lawyers call the Court and say they don't feel comfortable if
20 your client is going to appear, and, you know, the Court takes
21 those concerns very seriously and makes no conclusion on
22 whether they are valid, they are perceptions which drive
23 behaviors of other parties.  And to eliminate any of those
```

Ex. 1, Transcript of Pretrial Conference, at 84:11-23.

In addition to admitting having participated in multiple *ex parte* conversations in this case, the Court additionally made reference to "[Brian Manookian's] past behavior before the tribunals" when it ordered that depositions be conducted at the Courthouse over "security concerns" about Mr. Manookian.  But the Court did not disclose what it believed that "past behavior" to include, or where it acquired such information.

To be clear, Mr. Manookian has conducted or attended hundreds of depositions over the course of his career, including as a witness on multiple occasions.  No court has ever found that he acted even remotely inappropriately, much less in a physically threatening manner, during a deposition — nor, crucially, does the record in this case support such a finding.  The Court's ruling could have only been based upon its *ex parte* communications and extrajudicial research – and its view was so deeply held that it

offered it *sua sponte* based upon an extrajudicial record the Court itself endeavored to create.

### III. ARGUMENT

28 U.S.C. § 455(a) states that "[a]ny . . . judge . . . shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." This recusal standard is objective: the relevant inquiry is whether a "reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality." *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 800 (5th Cir. 1986) (internal quotation marks omitted), *aff'd*, 486 U.S. 847 (1988); *see Air Line Pilots Ass'n, Int'l v. Continental Airlines, Inc. (In re Continental Airlines Corp.)*, 901 F.2d 1259, 1262 (5th Cir. 1990); *In re Faulkner*, 856 F.2d 716, 720-21 (5th Cir. 1988).

"Ex parte contacts are improper where, given all the circumstances, they could cause a reasonable person to question that judge's impartiality." *Blixseth v. Yellowstone Mountain Club, LLC*, 742 F.3d 1215, 1219 (9th Cir. 2014). And "decisions made by the district court in reliance on any undisclosed ex parte communications are inappropriate." *United States v. Lanier*, 748 F. App'x 674, 678 (6th Cir. 2018) (citing *United States v. Hayes*, 171 F.3d 389, 390–91 (6th Cir. 1999)). "If any such communications do occur . . . the district court should endeavor to disclose, as appropriate, the ex parte communication to the parties as soon as possible." *Id.* at 678.

"Extrajudicial knowledge," meanwhile, is knowledge that the judge acquires "outside a courthouse." *Edgar v. K.L.*, 93 F.3d 256, 259 (7th Cir. 1996) (citations omitted). "The point of distinguishing between 'personal knowledge' and knowledge gained in a judicial capacity is that information from the latter source enters the record and may be controverted or tested by the tools of the adversary process. Knowledge

received in other ways, which can be neither accurately stated nor fully tested, is 'extrajudicial.' " *Id.*

The Court's repeated *ex parte* communications with practicing attorneys regarding this case and the parties to it – which were not disclosed at the time and only revealed by the Court to support a subsequent ruling, when the Court spontaneously revealed its concern about the "100 pound gorilla in the room on that issue" – require recusal. Indeed, the Court's ruling requiring that depositions be conducted in the courthouse was expressly premised upon concerns the Court developed based upon (1) *ex parte* communications about Mr. Manookian that Mr. Manookian had no knowledge of, nor any opportunity to rebut, and (2) the Court's views about "Mr. Manookian's past behavior before the tribunals" – again unspecified, and again, based upon information outside the record in this case. [8]

A reasonable observer would conclude that the Court has developed views of a litigant, based upon improper *ex parte* communications and information outside the record in this case, and – however unintentionally – has made a ruling based on those concerns. On any objective basis, recusal is appropriate and required, and is the course of action that best promotes respect for the rule of law.

The Court's statements confirm that it has entertained *ex parte* communications, failed to disclose those communications to the impacted parties, conducted its own

---

[8] The Court's views were so strongly – and mistakenly – held that it took a second unusual step, not just requiring that the depositions be held in the courthouse but also leaving instructions for the participants and setting a time for hearings on objections (a copy of which is attached as Exhibit 3). The depositions were predictably uneventful and conducted professionally by all parties, and no objections were brought to the Court. But the Court's overreaction to an ill-defined threat of misconduct based on not even a scintilla of record evidence, considered by a reasonable observer, further demonstrates that recusal is warranted here.

independent investigation into a litigant in this case, and has – most troublingly – formed impressions and opinions based upon the information gained in those improper exercises, relying on them in its rulings and approach to this case.

Of particular concern, the Court's multiple *ex parte* communications pertained to the character of a witness that, in the Court's view, "holds the keys to the kingdom," because – as the Court put it in partially denying the Manookian Parties' motion to compel discovery responses from the Trustee – the key knowledge in the case concerning the Trustee's allegations "is locked away deep inside Mr. Manookian's brain somewhere."[9] The Court emphasized Mr. Manookian's centrality to the case, volunteering that "while he's under oath he will enlighten the Trustee and the other parties on exactly what happened," enabling the Trustee to learn details about the allegations in her Complaint.[10] When in response to the Court, undersigned counsel stated that it was "certainly the Trustee's theory" that Mr. Manookian holds the "keys to the kingdom," the Court corrected counsel, stating, "It's not a theory, Mr. Spragens," and explaining that the Trustee could not be expected to provide further information about her adversary proceeding allegations because she merely stepped into "save the estate for the benefit of creditors based off the actions of the people who put it in bankruptcy."[11]

Taken together, these comments indicate that the Court has developed "concerns" that it takes "very seriously" about whether Mr. Manookian can attend a deposition at counsel's office without some unspecified harm occurring. The Court has formed the view that Mr. Manookian is the key witness whose testimony will unlock the case when he is

---

[9] Ex. 1, Transcript of Pretrial Conference, at 49:2-16.
[10] *Id.*
[11] *Id.*

put under oath, and it has also determined that he poses a threat to other individuals or the orderly proceeding of the case, such that he cannot be trusted to attend or give a deposition at counsel's office.  Those concerns are based exclusively upon *ex parte* communications and the Court's own investigation into, and extrajudicial impressions formed about, this key witness in the case.  Under these circumstances, where the Court is both law-giver and factfinder, the Court should, consistent with principles of fair dealing and judicial neutrality, recuse itself so another judge can preside over this case.

The Court's undisclosed *ex parte* communications and consideration of extrinsic information, all of which explicitly formed the basis of its ruling, are not the kinds of innocuous *ex parte* communications allowed under the Federal Rules.  *See, e.g.*, *Blixseth*, 742 F.3d 1215 at 1219-20 (permitting *ex parte* communications regarding scheduling and a non-public bankruptcy auction).  Instead, the communications and extrinsic evidence are relevant to the material disputed issues in the case and its forthcoming findings about the credibility of a material witness whom the Court believes holds the "keys to the kingdom" in this case.

In short, the Court's failure to promptly disclose the occurrence of *ex parte* communications, lack of disclosure about the total substance of, and participants to, those conversations, undertaking of an independent investigation into this matter, and reliance upon both *ex parte* communications and extrajudicial research require immediate recusal.  It further requires full disclosure of the circumstances and substance of the *ex parte* communications and extrajudicial materials considered by the Court.

## IV.  CONCLUSION

For all these reasons, the Court is required to immediately disqualify itself. Moreover, the Court should promptly submit a sworn declaration detailing the dates,

substance of, and parties to each of its *ex parte* communications as well as the particulars of its independent investigation.

Date:  May 5, 2022                                  Respectfully submitted,

                                                   */s/ John Spragens*
                                                   John Spragens (TN Bar No. 31445)
                                                   Spragens Law PLC
                                                   311 22nd Ave. N.
                                                   Nashville, TN 37203
                                                   T: (615) 983-8900
                                                   F: (615) 682-8533
                                                   john@spragenslaw.com

                                                   *Attorney for Manookian PLLC and*
                                                   *Brian Manookian*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed May 5, 2022 and served electronically upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.

                                                   */s/ John Spragens*





Charles M. Walker
U.S. Bankruptcy Judge
Dated: 5/11/2022

## IN THE UNITED STATTES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) Case No: 3:19-bk-07235 |
| Cummings Manookian, PLLC, | ) Chapter 7 |
| | ) Honorable Charles M. Walker |
| Debtor. | ) |
| _____ | ) |
| | ) |
| Jeanne Ann Burton, Trustee, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proceeding: 3:20-ap-90002 |
| | ) |
| Hagh Law, PLLC; Afsoon Hagh; and | ) |
| Manookian PLLC, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

### ORDER SETTING RESPONSE/OBJECTION DEADLINE
### AND SCHEDULING HEARING
### ON MOTION TO DISQUALIFY BANKRUPTCY JUDGE

THIS MATTER is before the Court on the motion to disqualify filed on May 5, 2022, located at Docket Entry #161. The Court being duly advised,

IT IS HEREBY ORDERED that:

(1) All responses/objections and filings related to the motion shall be filed no later than May 27, 2022.

(2) An evidentiary hearing is set for presentation of the motion on <u>June 29, 2022, at 1:00 p.m.</u>

(3) All parties and/or counsel must appear in person at the above scheduled date and time at Courtroom 2, Second Floor, Customs House, 701 Broadway, Nashville, Tennessee.

(4) Presentation of evidence is subject to applicable Federal and Local Rules.

*THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS*
*INDICATED AT THE TOP OF THE FIRST PAGE*

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| **IN RE:** | **Case No, 3:19-bk-07235** |
| | **Chapter 7** |
| **CUMMINGS MANOOKIAN, PLLC** | **Judge Walker** |
| Debtor. | **Adv. Proc. No. 3:20-ap-90002** |
| **JEANNE ANN BURTON, TRUSTEE** | |
| Plaintiff, | |
| v. | |
| **HAGH LAW, PLLC; AFSOON HAGH; and MANOOKIAN PLLC,** | |
| Defendants. | |

## NOTICE OF DEPOSITION OF JUDGE CHARLES M. WALKER

Pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7030, Manookian PLLC, by and through the undersigned counsel, respectfully gives notices that it will take the deposition of Judge Charles M. Walker on June 15, beginning at 10:00 a.m. Central time at 701 Broadway, Suite 260 Nashville, TN 37203. The deposition will be taken before a person authorized by law to administer oaths and will continue from day-to-day until the examination is complete. The depositions will be recorded by any means authorized by Fed. R. Civ. P. 30(b)(3), pursuant to Fed. Fed. R. Bankr. P. 7030, including audiovisually and stenographically.

1

The topics to be addressed are all non-privileged, relevant information; including, but not limited to, (1) Judge Walker and his staff's communications about this matter with third parties outside of court proceedings and (2) Judge Walker and his staff's investigation into this matter, the parties, or witnesses outside of the Court record.

Date:  May 31, 2022                                        Respectfully submitted,


                                                           */s/ John Spragens*
                                                           John Spragens (TN Bar No. 31445)
                                                           Spragens Law PLC
                                                           311 22nd Ave. N.
                                                           Nashville, TN 37203
                                                           T: (615) 983-8900
                                                           F: (615) 682-8533
                                                           john@spragenslaw.com

                                                           *Attorney for Manookian PLLC and*
                                                           *Brian Manookian*


### <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was filed May 31, 2022 and served electronically via upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.


                                                           */s/ John Spragens*



Charles M. Walker
U.S. Bankruptcy Judge
Dated: 7/25/2022



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No: 3:19-bk-07235 |
| Cummings Manookian, PLLC, | ) | Chapter 7 |
| Debtor | ) | Honorable Charles M. Walker |
| _____ | ) | |
| | ) | |
| Jeanne Ann Burton, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Adversary: 3:20-ap-90002 |
| | ) | |
| Hagh Law, PLLC, | ) | |
| Afsoon Hagh, | ) | |
| Manookian, PLLC, and | ) | |
| Defendants | ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANTS' MOTION FOR ENTRY OF UNOPPOSED
SUMMARY JUDGMENT ON ALL CLAIMS**

Defendants, Hagh Law, PLLC, Afsoon Hagh, and Manookian, PLLC, have moved this

Court for entry of unopposed summary judgment in their favor (See Dkt. #203, hereinafter

"Motion") as to all claims contained in the adversary complaint in advancement of their motion

for summary judgment (Dkt. #188) filed June 24, 2022. For the reasons stated below, the Motion

is DENIED.

**Procedural Posture**

This adversary proceeding was filed on January 8, 2020, by Jeanne Ann Burton, the

Chapter 7 Trustee in the underlying bankruptcy proceeding of Debtor Cummings Manookian,

PLLC, a now defunct law firm. (Dkt. #1). The complaint filed by the trustee put forward seven

claims for relief; conversion, state law fraudulent transfer, avoidance and recovery of fraudulent

transfers, tortious interference with contract, successor liability and alter ego, turnover, and declaratory judgement.

On May 5, 2022, Manookian, PLLC and Brian Manookian, a non-party to this proceeding, entered a Motion to Disqualify Bankruptcy Judge Charles M. Walker. (Dkt. # 161). In support of this motion, Defendant Manookian, PLLC entered a Notice of Deposition of Judge Charles M. Walker seeking testimony related to the circumstances alleged to provide grounds for recusal. (Dkt. #177). The Court entered an Order Quashing Notice of Deposition on June 1, 2022. (Dkt. #178). Brian Manookian and Manookian, PLLC appealed this Order to the United States District Court on June 14, 2022. (Dkt. #184). The matter currently remains pending on appeal.

On June 24, 2022, subsequent to the filing of the appeal, Defendants filed the aforementioned Motion for Summary Judgment, seeking summary judgment on all seven claims. (Dkt. #188). To date, the Plaintiff has filed no response to the Motion for Summary Judgment. The Motion for Recusal was set for hearing on June 29, 2022. At that time, the Court read a statement into the record wherein the effect of the appeal on the jurisdiction of this Court was acknowledged:

> Based on the pendency of the appeal in the United States District Court for the Middle District of Tennessee, this Court is divested of jurisdiction over aspects of the case subject to the appeal. Here, the appeal is from an Order Quashing a Deposition request in furtherance of a Motion to Disqualify the judge. The appeal is directly related to the issue of this judge's ability to render judgement in this case.
>
> *Statement of the Honorable Charles M. Walker read into the record on June 29, 2022, at hearing (See Exhibit A incorporated herein).*

On July 15, 2022, Defendants filed the instant Motion for Entry of Summary Judgement on All Claims and a proposed order.

2

## Discussion

"A federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously. The filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).

"This transfer of power, however, does not effect a total divestiture of jurisdiction from the district court: it retains jurisdiction to enforce its judgment, to proceed with matters that will aid the appellate process, and to adjudicate matter unrelated to the issues on appeal." *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 626 (6th Cir. 2013) (citations omitted). The limited jurisdiction which a district court retains to take actions in aid of an appeal is a "narrowly defined" class of actions, which "does not include actions that alter the case on appeal". *United States v. Carman*, 933 F.3d 614, 617 (6th Cir. 2019) (internal quotations omitted). See also *United States v. Gallion*, 534 Fed. Appx. 303, 310 (6th Cir. 2013) ("[T]he test of whether an issue is collateral to a claim on appeal, and therefore whether a district court may retain jurisdiction . . . considers whether the action by the district court would alter the status of the case as it rests before the Court of Appeals".)(citation omitted) "Any action of the district court pertaining to matters involved in the appeal is null and void and will be vacated". *Kelley v. St. Paul Fire & Marine Ins. Co.*, No. 87-1639, 1988 U.S. App. LEXIS 11765 at *8 (6th Cir. Aug. 29, 1988).

It is well settled law that entry or alteration of a judgment, including summary judgment, alters the status of a case such that it disturbs a matter on appeal. See *Knutson v. AG Processing, Inc.*, 302 F.Supp.2d 1023, 1030 (N.D. Iowa 2004)(citing *Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059, 1063 (5th Cir. 1990))(*rev'd on other grounds, Knutson v. AG Processing, Inc.*, 394 F.3d 1074 (8th Cir. 2005)). See also *Landman v. Mitchell*, 445 F.2d 274, 275 (5th Cir. 1971) (observing that a party's filing of an appeal divested the district court of jurisdiction to enter any order on that party's subsequent motion for summary judgment); *United States v.*

*Brown*, 17 Fed. Appx. 367, 368–69 (6th Cir. 2001) (declaring that a district court did not have jurisdiction to address a motion to dismiss an indictment pending an appeal); *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1013 (6th Cir. 2003) (emphasizing a distinction "between actions that merely aid the appellate process and actions that alter the case on appeal"); *United States v. Holloway*, 740 F.2d 1373, 1382 (6th Cir. 1984) (declaring that a district court lacked jurisdiction to alter the status of a sentence while an appeal was pending). *N.L.R.B. v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir. 1987) ("[A] district court may not alter or enlarge the scope of its judgment pending appeal"); *United States v. Harvey*, 996 F.3d 310, 313 (6th Cir. 2021) (determining that a district court could not issue an opinion after an appeal had been filed); *United States v. Sutton*, 573 Fed. Appx. 560, 562 (6th Cir. 2014) (filing of an appeal removed the district court's jurisdiction to enter a judgment); *Washington v. Kelly*, No. 1:05-CV-577, 2009 WL 233711 at *3 (N.D. Ohio Jan. 30, 2009) (declaring that a pending appeal removed the court's jurisdiction to consider either a motion for default judgment or a motion to disqualify the judge).

The appeal in this case is directly related to the ability of this Court to continue adjudication of this matter, and an entry of summary judgment would clearly alter the status of matters involved in the appeal. Therefore, because this Court lacks jurisdiction at this time to adjudicate the relief requested in the Motion and for the reasons stated in this Court's statement read into the record at the June 29, 2022, hearing (See attached Exhibit A incorporated herein), the Motion for Entry of Unopposed Summary Judgment on All Claims (Dkt. #203) is DENIED.

*THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS*
*INDICATED AT THE TOP OF THE FIRST PAGE*

# EXHIBIT   A

Burton v Hagh, et al                    20-ap-90002

**Statement Read Into the Record June 29, 2022**

On June 14, 2022, Defendant, Manookian PLLC and a member of that Defendant – a non-party to this proceeding - Brian Manookian, filed a Notice of Appeal and Statement of Election from this Court's June 1, 2022, Order Quashing the Notice of Deposition of Charles M. Walker, the judge assigned to the adversary, following the filing of a Motion to Disqualify the bankruptcy judge assigned this case.

Based on the pendency of the appeal in the United States District Court for the Middle District of Tennessee, this Court is divested of jurisdiction over aspects of the case subject to the appeal. Here, the appeal is from an Order Quashing a Deposition request in furtherance of a Motion for Disqualify the judge. The appeal is directly related to the issue of this judge's ability to render judgment in this case.

On the filing of a timely notice of appeal, the lower court is "[divested] of its control over those aspects of the case involved in the appeal" and the appellate court assumes jurisdiction. *Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982).* Once the appeal has been filed the court cannot take any action that would "alter the status of the case as it rests before the Court of Appeals". *Knutson v. AG Processing, Inc.,* 302 F.Supp.2d 1023, 1029 (N.D. Iowa 2004) (citing *Dayton Indep. Sch. Dist. V. U.S. Mineral Prods. Co.*, 906 F.2d 1059, 1063 (5th Cir. 1990))(*rev'd on other grounds*, *Knutson v. AG Processing, Inc.,* 394 F.3d 1074 (8th Cir. 2005)).

The Defendants have filed a Motion for Summary Judgment. Summary Judgement is considered among those action that are impermissible for a lower court to adjudicate as it would disturb the case before the appellate court. Considering that the Defendants seek a ruling on summary judgement on all claims, it follows that any ruling on such a motion would disturb the

case as it sits before the appellate court. Allan Ides, *The Authority of a Federal District Court to Proceed After a Notice of Appeal has Been Filed*, 143 F.R.D. 307, 308 (1992). *See also*, *Landman v. Mitchell*, 445 F.2d 274, 275 (5th Cir. 1971)(upholding a District Court's decision to enter no order on a motion for summary judgement that was filed three weeks after a notice of appeal due to lack of jurisdiction).

      The Plaintiffs have filed an Expedited Motion for Status Conference and this Court has entered an Order setting that Conference, as well as a deadline to reply to the motion.  Although the Court lacks jurisdiction to entertain any proceedings in this case that implicate the issues presented by the pending appeal, the Court retains limited authority to address ministerial affairs such as the evidentiary housekeeping issues present by the pending motion for a status conference, which has no bearing on the disposition of the appeal. "The filing of a notice of appeal is an event of jurisdictional significance — it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." Citing the *Griggs* case at P.58. "It is generally understood that a federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously." *Ibid*. However, in certain circumstances limited power is retained to address aspects of the case not involved in the appeal, when the court's action "do[es] not threaten the orderly disposition of the interlocutory appeal." *Sanford v. Russell*, 2019 WL 12074092, at *1 (E.D. Mich. June 4, 2019) (citations omitted). This Court therefore, may issue the scheduling of evidentiary motions, but will not rule on those issues pending the appellate process as such scheduling will not affect any rights at stake in the pending appeal. Pretrial and Status Conference are set for July 13, 2022, at 11:00 a.m. in person in this Courtroom.

7

Therefore, given the issue on appeal, all matters before this Court are stayed pending the appeal. Ruling on discovery issues is stayed as well, except that the scheduling order entered regarding the Motion for Status Conference remains in effect. Moreover, the Court notes that the appeal is from one order of this Court and does not serve to disturb orders previously entered in this case.

This Order has been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.

**UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| IN RE: CUMMINGS MANOOKIAN, PLLC,    ) | |
|                     ) | |
|      **Debtor**               ) | |
|                     ) | |
| **BRIAN MANOOKIAN,**         ) | |
|                     ) | |
|      **Appellant**           ) | |
|                     ) | |
|    **v.**                   ) | **No: 3:21-cv-00797** |
|                     ) | |
| **JEANNE ANN BURTON, TRUSTEE,**   ) | |
|                     ) | |
|      **Appellee.**           ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This bankruptcy appeal presents the question of whether the Bankruptcy Court applied the correct legal standard in determining that the debtor lacked standing to challenge a proposed settlement agreement. Because the Court finds that it did not, the settlement agreement will be vacated and this case will be returned to the Bankruptcy Court for further proceedings.

### I.

Brian Manookian, the appellant herein, filed a voluntary petition for Chapter 7 relief on behalf of the debtor, Cummings Manookian, PLC, a defunct Tennessee law firm. Jeanne Ann Burton, the appellee herein, was appointed to serve as the Chapter 7 Trustee for the estate of Cummings Manookian, PLC. Burton, in turn, sought to employ Thompson Burton, PLLC as special counsel, ostensibly because Phillip Young, a member of that firm, had been serving as receiver for the collection of the Debtor's accounts receivable in a state court action that was pending at the time the bankruptcy petition was filed. Over appellant's objection that such employment would create a

conflict of interest, the Bankruptcy Court approved the employment of Thompson Burton.

At issue on this appeal is Claim 5, or the Chase Claim, which is the largest claim brought against the estate.  This is an unsecured claim filed by Dean Chase, Sandra Chase, and D.F. Chase, Inc. ("the Chase Parties" or "the Chase Claims") that arose from a sanctions judgment issued by Williamson County Circuit Court Judge Michael Binkley worth somewhere in the neighborhood of $750,000 to $800,000, with appellant putting the figure at $748,769.21 (which may have been the amount of sanctions imposed by the judge) and the appellee placing the figure at $806,927.04 (which may have been the entire amount listed in Claim 5).  Regardless, the sanctions judgment was vacated by the Tennessee Court of Appeals because the trial judge harbored animus against Manookian.  The appeals court also ordered a "retroactive recusal," and remanded the case for further proceedings before a different trial judge.  Chase v. Stewart, No. M201801991COAR3CV, 2021 WL 402565, at *6 (Tenn. Ct. App. Feb. 4, 2021).

The Bankruptcy Trustee agreed to settle the Chase Claim for $250,000, and that decision was approved by the Bankruptcy Judge.  The propriety of the decision by the Trustee to settle the claim, however,  is disputed by the parties.

The Trustee claims that the decision to settle was straight-forward.  At the time the Petition in bankruptcy was filed, the sanctions judgment was on appeal, but the underlying case was not stayed, making the Chase Claim "valid and enforceable."  (Doc. No. 9 at 7).  Even though the sanctions judgment was later vacated by the state appellate court, a new judge would have to determine whether sanctions were appropriate.  "In the face of th[is] uncertainty," the Trustee decided to settle the Chase Claim for a fraction of its value in order to "reduce[] the potential exposure of the estate," and "allow[] the estate to avoid lengthy and costly ongoing litigation."  (Id.

2

at 8).

Manookian presents a much more nefarious scenario. According to him, while the sanction judgment was on appeal in the state court, the Chase Parties filed a collections action in the Williamson County Chancery Court to create a receivership over Cummings Manookian's accounts receivable. Phillip Young, the same attorney who would later be appointed special counsel to the bankruptcy Trustee, was appointed as a receiver to collect on the judgment, and he immediately began placing liens on Cummings Manookian's receivables and levying on them as they came due. Young allegedly collected, and paid to himself, tens of thousands of dollars owed to Cummings Manookian, and instituted adversary proceedings against it.

After the appeals court issued its opinion vacating the sanctions judgment, the Chase Parties sought rehearing. Two days after that request was denied, the Chase Parties sent a settlement letter to Manookian's counsel, offering to "walk-away" from their claim in exchange for "no payment" and the signing of mutual releases. (Doc. No. 5 at 8). Days later, however, the Chase Parties "*sua sponte* and gratuitously announced they had agreed to pay all of Phillip Young's outstanding fees in the State Collections action." (Id. at 9). Shortly thereafter, Young, on behalf of the Bankruptcy Trustee, oddly proposed to pay the Chase Parties $250,000 as settlement for their claims, a vastly different outcome from the "walk away" settlement originally proposed.

It was against this backdrop that the Bankruptcy Court was presented with the Trustee's Motion to Approve Compromise and Settlement of the Chase Claim. The Bankruptcy Court held a bifurcated hearing on September 29, 2021. During the first phase, the issue of whether Manookian had standing to object to the proposed settlement was addressed, and the Bankruptcy Court found

Case 3:21-cv-00797 Document 5-11 Filed 08/04/22 Page 30 of 134 PageID #: 2886

that he did not.  During the second phase, the Bankruptcy Court  considered the settlement motion

and an objection that had been filed by attorney John R. Konvalinka.  Ultimately, the Bankruptcy

Court found that "[t]he Trustee properly exercised her business judgment in reaching the proposed

settlement of the Claim filed by the Chase Parties as proposed in the Settlement Motion," and

approved the proposed settlement.  (Doc. No. 1-3 at 3).  Whether the Bankruptcy Court committed

legal error in ruling that Manookian lacked standing is the subject of the appeal.

## II.

On appeal from the bankruptcy court, findings of fact are reviewed under the clearly

erroneous standard, while conclusions of law are reviewed *de novo*.  Rogan v. Bank One, N.A. (In

re Cook), 457 F.3d 561, 565 (6th Cir. 2006).  " Furthermore, when a question in the bankruptcy

context involves a mixed question of law and fact, [the court] must break it down into its constituent

parts and apply the appropriate standard of review for each part."  In re Am. HomePatient, Inc., 420

F.3d 559, 563 (6th Cir. 2005) (quoting Wesbanco Bank Barnesville v. Rafoth (In re Baker & Getty

Fin. Servs., Inc.), 106 F.3d 1255, 1259 (6th Cir.1997).

"A trustee in bankruptcy has the authority to seek a settlement of claims available to the

debtor, but any proposed settlement is subject to the approval of the bankruptcy court, which enjoys

'significant discretion.'"  In re MQVP, Inc., 477 F. App'x 310, 312–13 (6th Cir. 2012) (citing Fed.

R. Bankr. P. 9019(a); In re Rankin, 438 F. App'x. 420, 426 (6th Cir.2011)).  "When determining

whether to approve a proposed settlement, the bankruptcy court may not rubber stamp the agreement

or merely rely upon the trustee's word that the settlement is reasonable," but instead is under "an

affirmative obligation to apprise itself of the underlying facts and to make an independent judgment

as to whether the compromise is fair and equitable." <u>Id.</u> (citing <u>Reynolds v. C.I.R.</u>, 861 F.2d 469, 473 (6th Cir.1988)).

In finding that Manookian did not have standing to contest the proposed settlement, the Bankruptcy Court orally ruled:

> Mr. Manookian, to date, has not offered any *concrete* evidence, and I'll use that same word that Mr. Young has used, that this is a surplus case. What has been shown is there are many variables. As I've already mentioned, that go into determining the exact monetary value of bankruptcy estate.
>
> In this instance, the burden was on Mr. Manookian to produce *something tangible and concrete* that the Court could rely on in making a determination that the [sic] it's *a high likelihood* that this case would be a surplus case.

(Doc. No. 4-1, Hearing Transcript at 53-54) (emphasis added). This was legal error because it placed too heavy a burden on Manookian to establish standing.

"[T]he standing question is purely a legal one," <u>Moran v. LTV Steel Co. (In re LTV Steel Co.)</u>, 560 F.3d 449, 452 (6th Cir.2009), and in the bankruptcy context only those that "are adversely affected pecuniarily" have standing, <u>In re Moran</u>, 566 F.3d 676, 680 (6th Cir. 2009). "Debtors, particularly Chapter 7 debtors, rarely have such a pecuniary interest because no matter how the estate's assets are disbursed by the trustee, no assets will revert to the debtor." <u>In re Lunan</u>, 523 F. App'x 339, 340 (6th Cir. 2013) (citing <u>Cult Awareness Network, Inc. v. Martino (In re Cult Awareness Network, Inc.)</u>, 151 F.3d 605, 607 (7th Cir.1998)). Where, however, a debtor can show that the estate has assets in excess of liability that would entitle him or her to a distribution of the surplus, then the debtor has standing as a "person aggrieved." <u>Id.</u> In this regard, "[t]he debtor must show more than a metaphysical possibility of surplus; instead it 'must show that such surplus is a reasonable possibility.'" <u>In re Khan</u>, 544 F. App'x 617, 619 (6th Cir. 2013) (quoting <u>In re Lunan</u>,

Case 3:21-cv-00797 Document 5-11 Filed 08/04/22 Page 132 of 134 PageID #: 3088

523 Fed. App'x at 340).

Because Manookian did not present "something tangible and concrete" to establish a "high likelihood" there would be a surplus (as opposed to a reasonable possibility), he was unable to argue against the proposed settlement, and this may have affected his due process rights. Although the Trustee argues that Manookian's "interests were . . . considered" because Konvalinka's objections were heard during the second phase of the bifurcated hearing (Doc. No. 9 at 8), and while the Bankruptcy Court stated that "there is no harm to Mr. Manookian because the Court still is addressing the sufficiency of the settlement agreement in which the Trustee is attempting to enter into," (Doc. No. 4-1 at 56), different litigant's arguments do not necessarily go hand-in-hand, nor are they always fungible. As the Bankruptcy Court observed with regard to the propriety of the settlement agreement, "Mr. Manookian . . . doesn't get his day in court, but the issue gets its day in court." (Doc. No. 4-1 at 55). Nevertheless, a litigant's due process deserves consideration applying the correct legal standard.

In their respective briefs, the parties suggest that there either was or was not a reasonable possibility of a surplus, and this Court could make that determination based upon the appellate record. However, because "[a] bankruptcy court's finding that a reasonable possibility of a surplus does not exist is a finding of fact," In re Licata, 659 F. App'x 704, 706 (2d Cir. 2016), the Court will leave it to the Bankruptcy Judge to make that determination under the proper standard because he is intimately familiar with the facts of this case.

### III.

For the foregoing reasons, the Bankruptcy Court's "Order Granting Motion to Approve

6

Compromise and Settlement and Finding that Brian Manookian Lacks Standing" (Doc. No. 1-3) is

hereby **VACATED**.  This case is **REMANDED** to the Bankruptcy Court for further proceedings not

inconsistent with this Memorandum Opinion.

IT IS SO ORDERED.

_____

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE